# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     . CRIMINAL NO. 19-10479-DJC
.
       V.           . BOSTON, MASSACHUSETTS
. NOVEMBER 6, 2019
BRUCE SARTWELL          .
   Defendant         .
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF PROBABLE CAUSE
AND DETENTION HEARING
BEFORE THE HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
Lindsey E. Weinstein, Esq.
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3100
lindsey.weinstein.herscovici@usdoj.gov

FEDERAL PUBLIC DEFENDER OFFICE
Jessica P. Thrall, Esq.
Oscar Cruz, Esq.
51 Sleeper Street, 5th Floor
Boston, MA 02110
617-223-8061
Jessica_Thrall@fd.org
Oscar_Cruz@fd.org

Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                          I N D E X

2  WITNESS          DIRECT     CROSS     REDIRECT      RECROSS

3  Michael Nagle    5          40        46           48

4  EXHIBITS    DESCRIPTION                            IN EVID.

5    1       Complaint Affidavit                      7

6    2A      Package with Clothes                     10

7    2B      Package with Firearm Silencer            10

8    2C      Package with Body Armor Plates           10

9    3       Photographs of Garage, Airsoft Weapon    12

10   4       Photograph                               14

11   5       Photograph of Rifle; 30 round magazines;

12               jigs; pistol blank guns              16

13   6       Photograph of Inside Panel               17

14   7       Enlarged Photograph                      18

15   8       Photograph of Rifle (Airsoft use Only)   19

16   9       Report                                   20

17   10      Photograph of Different Angles of AR-15  21

18   11      Photograph of Bump Stock                 22

19   12A     Photograph of Drawers under Workbench    24

20   12B     Photograph of Hidden Compartment         24

21   12C     Photograph of Silencer                   24

22   13      Photograph of Mirror Room                28

23   14      Photograph of Safe, Drill Bit Guide,

24               Instruction Manual                   30

25   15      Photograph of Nightstand with Items      34

3

| EXHIBITS | DESCRIPTION | IN EVID. |
|---|---|---|
| 16 | Photograph of Items found in Bedroom Closet | 35 |
| 17 | Photograph of Items Seized | 35 |
| 18 | Superior Court Docket | 37 |
| 19 | Brockton Police Report | 38 |

4

1   (Court called into session)

2   (11:07:44 a.m.)

3           THE CLERK:  Today is Wednesday November 6, 2019,

4   and we're on the record in Criminal Case No. 196551, the

5   United States v. Bruce Sartwell.  The Honorable M. Page

6   Kelley presiding.

7           Will counsel please identify themselves for the

8   record.

9           MS. WEINSTEIN: Good morning, Your Honor, Lindsey

10  Weinstein on behalf of the United States.

11          THE COURT:  Good morning.

12          MR. CRUZ:  Good morning, Your Honor, Oscar Cruz

13  with Jessica Thrall for Mr. Sartwell.

14          THE COURT:  Good morning, and good morning, Mr.

15  Sartwell.

16          THE DEFENDANT:  Good morning, Your Honor.

17          THE COURT:  So we're here for probable cause and

18  detention.  And what's the position of the parties?

19          MS. WEINSTEIN:  The government is prepared to

20  move forward with the hearing at this time.  I do have one

21  witness present.

22          THE COURT:  Okay.  So shall we call the witness?

23  Yes?

24          MR. CRUZ:  Your Honor, if I could just ask that

25  the government put on the record what the basis for the

5

1  request for detention are one more time?

2          THE COURT:  Oh, sure.

3          MR. CRUZ:  I would appreciate that.

4          MS. WEINSTEIN:  Yes, Your Honor.  As I had moved

5  for last week, the government had previously moved for

6  detention on the following grounds, danger to the

7  community under 18 U.S.C. Section 3142(f)(1), specifically

8  3142(f)(1)(E), and also under risk of flight, 18 U.S.C.

9  3142(f)(2)(A).

10          MR. CRUZ:  Thank you.

11          THE COURT:  Okay.  So you may call your witness.

12          MS. WEINSTEIN:  Thank you, Your Honor.  The

13  government calls Special Agent Michael Nagle.

14      GOVERNMENT WITNESS, MICHAEL NAGLE, SWORN

15          THE CLERK:  Can you please state your full name

16  and spell your last name for the record.

17          THE WITNESS:  Michael Nagle, N-A-G-L-E.

18                  DIRECT EXAMINATION

19  BY MS. WEINSTEIN:

20  Q.   Good morning, sir.  Where are you employed and how

21  long have you been employed there?

22  A.   I'm a special agent with Homeland Security

23  Investigations.  I've been employed with HSI and another

24  law enforcement agency for approximately eight years.

25  Q.   And can you just give a rundown of your training and

6

1   experience and your work in law enforcement?

2   A.   As a special agent, we attend the Federal Law

3   Enforcement Training Center and it's about a five-and-a-

4   half-month criminal investigation course.  And then I've

5   received additional advanced training in a variety of

6   different issues throughout the years.

7   Q.   And prior to today's date, can you give an overview

8   of how you familiarized yourself with the investigation

9   involving Mr. Sartwell?

10   A.   I was present during the search warrant and arrest of

11   Mr. Sartwell and then I've also reviewed reports,

12   photographs and spoken with other law enforcement

13   officers.

14   Q.   Okay.  Putting on the overhead what has been marked

15   as Government's Exhibit 1, it's fair to say that this is

16   the complaint affidavit authored by one of your

17   colleagues; is that correct?

18   A.   Yes, ma'am.

19   Q.   And to the best of your knowledge is everything in

20   there fair and accurate?

21   A.   There is one correction that I wanted to make.  In

22   paragraphs 25 and 26 there's references to two firearm

23   silencers being found and seized when in actuality one

24   silencer was found within a draw in the garage, and then

25   when agents or officers found it, it sort of fell or was

7

1   put into a toolbox next to it and it was documented

2   incorrectly that there were two silencers.  In reality it

3   was the same one.

4   Q.   So that relates to the silencer that was found in the

5   garage; is that correct?

6   A.   Yes, ma'am.

7   Q.   And that is separate and apart from the one that was

8   found inside the controlled delivered package, correct?

9   A.   That's correct.

10         MS. WEINSTEIN:  Okay.  Government moves to admit

11   the complaint affidavit as Exhibit 1.

12         MR. CRUZ:  No objection.

13         THE COURT:  Okay, so admitted.

14   GOVERNMENT'S EXHIBIT NO. 1, ADMITTED

15   BY MS. WEINSTEIN:

16   Q.   Putting on the overhead right now Exhibit -- or can

17   you just describe generally what happened on the date of

18   the execution of the search warrant?

19   A.   Yes.  It was October 30, 2019.  United States Postal

20   Inspection Service postal inspector acting undercover

21   capacity conducted a controlled delivery of the seized

22   firearm silencer as well as two other packages that were

23   destined to be delivered to 157 Plymouth Street in East

24   Bridgewater, Massachusetts.  He, the postal inspector

25   delivered it to, and Mr. Sartwell received it and then

1  afterwards a search warrant or almost immediately

2  afterwards a search warrant was executed at that home, 157

3  Plymouth Street in East Bridgewater, and agents and

4  officers from various different federal and local agencies

5  conducted a search warrant there.

6  Q.   Okay.  And did agents approach Mr. Sartwell when he

7  was, after he had accepted the packages?

8  A.   Yes, they did.

9  Q.   And where was he encountered?

10  A.   I believe he was walking from the driveway into his

11  backyard.  I don't know exactly where in that walk he was

12  encountered.

13  Q.   Okay.  And on the overhead right now is what's been

14  marked as Government's Exhibit 2, 2A, 2B and 2C.  Can you

15  tell the Court what is portrayed in these items?

16  A.   The small black package with brown or yellow tape

17  there in the foreground is the firearm silencer that was

18  seized by customs and border protection at the JFK mail

19  facility.  And that was delivered to that address, 157

20  Plymouth Street.  There's also another package which was

21  found later to contain clothes, that sort of soft sided

22  package, and then the hard-sided package, the third

23  package down, contained body armor plates.

24          THE COURT:  Contained what?

25          THE WITNESS:  Body armor plates.

1     THE COURT:  Okay.  Thank you.

2  BY MS. WEINSTEIN:

3  Q.   Okay, so these were the three packages that were

4  delivered to Mr. Sartwell on October 30th, correct?

5  A.   Yes, ma'am.

6  Q.   And only the top one, the black and yellow one, was

7  the one that was known or labeled as a fuel filter coming

8  from China and in fact contained a firearm silencer as

9  defined under federal law, correct?

10  A.   That's correct.

11  Q.   Okay.  And so these two other packages were correctly

12  independently delivered; is that right?

13  A.   They were not seized by law enforcement prior to this

14  delivery, yes.

15  Q.   Okay.  So Government's Exhibit 2B it's fair to say

16  that this is what the contents of that package, what was

17  within the firearm silencer package; is that right?

18  A.   Yes, ma'am.

19  Q.   Okay.  And Exhibit 2C this is that larger U.S.P.S.

20  package on the bottom; is that correct?

21  A.   That's correct.

22  Q.   And that was bottom armor?

23  A.   Yes.

24     MS. WEINSTEIN:  Okay.  Government moves to admit

25  this as the next, or Exhibits 2A, B and C.

10

1      MR. CRUZ:  No objection.

2      THE COURT:  Okay, so admitted.

3      GOVERNMENT'S EXHIBIT NOS. 2A, 2B AND 2C, ADMITTED

4  BY MS. WEINSTEIN:

5  Q.   And so, Agent Nagle, you were present during the

6  course of the search warrant, correct?

7  A.   Yes.

8  Q.   And while you were present, describe generally what

9  happened during the execution of the search?

10  A.   Well Mr. Sartwell was encountered and placed in

11  handcuffs while the, a special response team cleared and

12  made safe the home.  After that agents and officers began

13  taking preliminary steps to sort of meticulously and

14  thoroughly search the residence so there were different

15  room designations put up in different areas, things of

16  that nature.  And then agents and officers spread out

17  throughout the property and searched.

18  Q.   Okay.  So I'm going to start with the garage.  Did

19  you have the opportunity to enter the garage during the

20  course of the search warrant execution?

21  A.   Yes, I did.

22  Q.   Can you describe generally what was viewed when you

23  first entered it?

24  A.   When you walked into the garage there was a bar off

25  to your right.  There was a set of staircases that went up

11

1    to a second level on the back right side of the garage.

2    There's a motorcycle parked sort of in the middle of the

3    garage, and then there was work benches or a workbench and

4    toolbox on the far side of the garage as you entered.

5    There's also seating somewhere in the garage. I think off

6    to the left when you walked in, but I don't recall exactly

7    where that was.

8    Q.   Okay.  So just based, just to put us in that

9    situation, did it appear that this was a location where

10   Mr. Sartwell or his family members stored their vehicles?

11   A.   Aside from the motorcycle, no.

12   Q.   And why is that?

13   A.   There, there was sort of living space there in the

14   bar and seating in there, with the motorcycle in there I

15   wouldn't say there's enough room for a vehicle on top of

16   that.

17   Q.   Okay.  Putting up a government's marked as Exhibit 3,

18   the first one is 3A, can you tell us where in the garage

19   that is located?

20   A.   Yes.  As you enter the garage, and when I say enter

21   the garage it's sort of the side door where a person could

22   fit, not the bay door, that was a wall off to your right.

23   Q.   Okay.  And are you aware of what these items are?

24   A.   Those I believe were all airsoft guns.

25   Q.   Okay.  And what are airsoft guns?

12

1  A.    Airsoft guns are guns that fire a plastic

2  projectile or BB.

3  Q.    Okay.  And off to your right there's a sign.  What

4  did that sign say?

5  A.    I believe it said Monsters Way.

6  Q.    Okay.  And are you aware of any nickname for Mr.

7  Sartwell?

8  A.    Monster.

9  Q.    Exhibit 3B, it's fair to say that this is one of the

10  airsoft weapons; is that correct?

11  A.    Yes, ma'am.

12  Q.    Okay.  Exhibit 3C this is another one; is that

13  correct?

14  A.    That's correct.

15  Q.    Okay.  And Exhibit 3D where is this?

16  A.    This I believe it was off to the right side of that

17  airsoft wall but I couldn't tell you exactly where it is.

18  Q.    Okay, but it's within the garage?

19  A.    Yes, ma'am.

20          MS. WEINSTEIN:  Okay.  Government moves to admit

21  this as Exhibit 3.

22          MR. CRUZ:  No objection.

23          THE COURT:  Okay, so admitted.

24      GOVERNMENT'S EXHIBIT NO. 3, ADMITTED

25  BY MS. WEINSTEIN:

13

1    Q.   So affixed to some of these airsofts are foam

2    silencers; is that correct?

3    A.   Ahh, --

4    Q.   Or suppressors?

5    A.   As I understand it, yes.

6    Q.   Okay.  And those aren't real silencers as defined

7    under federal law; is that right?

8    A.   That's correct.

9    Q.   Okay, but these are the ones that are on display in

10   Mr. Sartwell's home; is that correct?

11   A.   Yes, ma'am.

12   Q.   Okay.  You mentioned that there was a bar.  Can you

13   describe that bar a little bit?

14   A.   It was a, I guess a large C shape bar or L shape bar.

15   It was made of wood and it had sort of crown molding along

16   the edges of it, and then there were plywood pieces on the

17   inside that were screwed in against it.

18   Q.   Okay.  On the overhead right now is Governments'

19   Exhibit 4.  Where in proximity to the bar is this picture

20   being taken from?

21   A.   If you're standing behind the bar, the long portion

22   of the bar is off to your right here that has some tools

23   and pieces on it but then the, the short side of the bar

24   here would be off to your left if you were sort of

25   standing at the long side.

14

1  Q.   Okay.  And so this is as if you're entering the bar

2  behind the bar; is that right?

3  A.   Yes.

4  Q.   Okay.

5  A.   There's two ways to enter it but yeah, that's one way

6  you could have, yeah.

7  Q.   Okay.  This wooden panel -- are you familiar with

8  what canines did when they approached that wooden panel?

9  A.   It's my understanding that they indicated to possibly

10  the presence of, it indicated that there were gun dogs or

11  firearms locating dogs and I believe that they indicated a

12  possible presence there.

13       MS. WEINSTEIN:  Okay.  Government moves to admit

14  this as Exhibit 4.

15       MR. CRUZ:  No objection.

16       THE COURT:  Okay, so admitted.

17     GOVERNMENT'S EXHIBIT NO. 4, ADMITTED

18  BY MS. WEINSTEIN:

19  Q.   And so when the ballistics dogs indicated on that,

20  I'm showing grand jury or Government Exhibit 5, can you

21  tell us what this is and what we're looking at?

22  A.   That same piece of plywood that was in the previous

23  photo has been removed at this point and it revealed these

24  mostly blank guns or starting guns as well as that, the

25  rifle there.

15

1   Q.   Okay, so when you say the rifle there, are you

2   referencing the one in the bottom?

3   A.   Yes, ma'am.

4   Q.   And can you describe generally what we're looking at

5   here in this bottom section?

6   A.   Umm --

7   Q.   The items.

8   A.   So there are, there's the unregistered rifle there,

9   right there in the middle behind the bungee cords.

10  There's also two I believe 30 round magazines, one is

11  inserted in the rifle and one is off to the left.  There's

12  also two jigs off to the bottom right of the photo and

13  then there's the other pistol blank guns up at the top

14  shelf.  And I believe, it's tough to see in the photo

15  here, but I think there's another piece off to the left of

16  the rifle as well.

17  Q.   Okay.

18           THE COURT:  I'm sorry, what was the last thing

19  you pointed at, jigsaw?

20           THE WITNESS:  So there's two jig pieces down in

21  the bottom right.

22           THE COURT:  I'm sorry; I don't know what that

23  means.

24           THE WITNESS:  So jigs are used to guide a drill

25  bit or other power tools, and in this case it's our

16

1   assumption that those jigs were used to finish the rifle

2   that was present in this photo.

3   BY MS. WEINSTEIN:

4   Q.   So --

5           THE COURT:  And what, can I just ask were the

6   magazines loaded?

7           THE WITNESS:  No, they were not.

8           THE COURT:  No.

9           THE WITNESS:  I believe one of them had two

10  inert or dummy rounds but no live ammunition.

11          MS. WEINSTEIN:  Okay.  And the government moves

12  to admit this as Exhibit 5, Your Honor.

13          MR. CRUZ:  No objection.

14          THE COURT:  Okay.

15      GOVERNMENT'S EXHIBIT NO. 5, ADMITTED

16  BY MS. WEINSTEIN:

17  Q.   And so Government's Exhibit 6 fair to say that this

18  is when the items from that inside panel were taken out;

19  is that correct?

20  A.   Yes, ma'am.

21  Q.   Okay.  And can you explain to the Court what we're

22  looking at in Government's Exhibit 6 and what the

23  significance is of these items being found together?

24  A.   So again it's the rifle, the two magazines, the two

25  jigs and then a mill plate and from what I understand the

17

1  two jig pieces and the mill plate.  These guns in this

2  case are considered 80% guns when they're, typically when

3  they're purchased by somebody and then an individual can

4  use these pieces to then finish the last 20% to create an

5  operable firearm that's considered a firearm under U.S.

6  law.

7  Q.   Okay.  And so these magazines fit each 30 rounds; is

8  that correct?

9  A.   That's what I've been told, yes, ma'am.

10  Q.   Yeah.  And that would be a large capacity magazine

11  under federal law; is that correct?

12  A.   Yes, ma'am.

13        MS. WEINSTEIN:  Okay.  Government moves to admit

14  this as Exhibit 6.

15        MR. CRUZ:  No objection.

16     GOVERNMENT'S EXHIBIT NO. 6, ADMITTED

17  BY MS. WEINSTEIN:

18  Q.   And Exhibit 7 now on the overhead, can you describe

19  what this is?

20  A.   It's a larger photo of the previous.  It also

21  includes an airsoft gun off to the left in addition to the

22  other tools and items that I earlier referenced.

23        MS. WEINSTEIN:  Okay.  And the government moves

24  to admit this as Exhibit 7.

25        MR. CRUZ:  No objection.

18

1          THE COURT:  Okay.

2          GOVERNMENT'S EXHIBIT NO. 7, ADMITTED

3    BY MS. WEINSTEIN:

4    Q.   Okay.  Showing you Exhibit 8, can you describe what

5    this is?

6    A.   That's the same rifle that's been described in

7    previous photos.

8    Q.   Okay.  And on the top of this photograph it has

9    something listed on the scope; is that right?

10   A.   Yes, it says for airsoft use only.

11   Q.   Okay.  And are you familiar with any testing that was

12   done of this item?

13   A.   Yes, ATF agents conducted a test fire of it and it

14   was --

15   Q.   Okay, and despite it having a scope on it that says

16   it's only for fake weapons, are you familiar with what

17   the, what the results of that test were?

18   A.   It successfully fired live ammunition through it.

19   Q.   Okay.

20          THE COURT:  I'm sorry, can you say that more

21   cleanly?

22          THE WITNESS:  It successfully fired live

23   ammunition.  It operated --

24          THE COURT:  Okay.

25          THE WITNESS:  -- as a firearm.

19

1          THE COURT:  Okay.

2          MS. WEINSTEIN:  Okay, government moves to admit

3   this as Exhibit 8.

4          MR. CRUZ:  No objection.

5      GOVERNMENT'S EXHIBIT NO. 8, ADMITTED

6   BY MS. WEINSTEIN:

7   Q.   Now I'm putting on the overhead now a series of

8   reports from ATF.  It's fair to say that there's an ATF

9   agent present on October 30, 2019 for the testing of the,

10  what, this weapon; is that correct?

11  A.   Yes.

12  Q.   And you've reviewed these reports and the photographs

13  that are attached; is that correct?

14  A.   I have.

15  Q.   Okay.  And to the best of your knowledge they fairly

16  and accurately represent the testing and the examinations

17  that were done on scene; is that right?

18  A.   Yes, ma'am.

19  Q.   And the last page of this is a report that was done

20  on, testing that was done on October 31, 2019; you

21  reviewed this as well; is that correct?

22  A.   Yes, I have.

23  Q.   And that relates to a successful test fire of this

24  item that was done on that particular date; is that right?

25  A.   That's correct.

20

1          MS. WEINSTEIN:  Okay.  Government moves to

2  admit this as the next exhibit.

3          MR. CRUZ:  No objection.

4          THE COURT:  Okay.  Admitted.

5      GOVERNMENT'S EXHIBIT NO. 9, ADMITTED

6  BY MS. WEINSTEIN:

7  Q.   So the item was described generally as a ghost gun;

8  is that right?

9  A.   Yes.

10  Q.   Okay.  Can you describe what that is?

11  A.   From my understanding it's a term used to describe a

12  gun that has not, doesn't have a manufacturer or serial

13  number on it.  It's essentially sort of a homemade gun.

14  Q.   Okay.  And on paragraph five of Government's Exhibit

15  9, it says they seize an AR style short barreled rifle

16  that was concealed within a hidden compartment, the side

17  of the bar, in the garage; is that right?

18  A.   That's correct.

19  Q.   Okay.  And so the weapon that you just reviewed the

20  photographs of and just described was essentially assault

21  rifle; is that correct?

22  A.   Yes, it was a rifle, yup.

23  Q.   Okay.  And found within that same garage there was a

24  guide; is that correct?

25  A.   Yes, there was.

21

1    Q.   And can you describe what was found within that

2    garage related to a guide for AR 15s?

3    A.   It's a, this here in Exhibit 10A is a cleaning pad I

4    guess but it also shows a breakdown of AR 15 parts and

5    that was found within the garage as well.

6    Q.   Okay.  So Exhibit 10A, 10B and 10C shows different

7    angles of the same pad that outlines 85 different parts

8    for an AR-15 and how they're assembled; is that correct?

9    A.   Yes, ma'am.

10            MS. WEINSTEIN:  Okay.  Government moves to admit

11   this as Exhibit 10.

12            MR. CRUZ: No objection.

13            THE COURT:  Okay.  Admitted.

14       GOVERNMENT'S EXHIBIT NO. 10, ADMITTED

15   BY MS. WEINSTEIN:

16   Q.   And are you aware of items that were found listed on

17   this AR-15 guide on how to assemble assault rifles found

18   within that garage?

19   A.   I do know for sure that number two and three, a

20   buffer spring and buffer two were found in the garage I

21   believe on the bar.

22   Q.   Okay.  Showing you Government's Exhibit 11, do you

23   recognize this?

24   A.   Yes.

25   Q.   What is that?

22

1  A.    That is a, a bump stock.

2  Q.    What's a bump stock?

3  A.    It's a part of a firearm or rifle.

4  Q.    And what is the purpose in it for the firearm or

5  rifle?

6  A.    An individual shooting a rifle puts that against the

7  crease of their shoulder and uses that to absorb recoil or

8  uses it while operating the firearm.

9  Q.    Okay, so that was listed as item number 12 on the

10 guide of how to assemble an assault rifle; is that

11 correct?

12 A.    Yes, ma'am.

13 Q.    Okay.  Where was this bump stock found?

14 A.    It was in the garage.  I don't know exactly where

15 within the garage though.

16        MS. WEINSTEIN:  Okay.  Government moves to admit

17 this photograph as Exhibit 11.

18        MR. CRUZ: No objection.

19        THE COURT:  Okay, admitted.

20     GOVERNMENT'S EXHIBIT NO. 11, ADMITTED

21 BY MS. WEINSTEIN:

22 Q.    And during the course of the search of the garage --

23 I'm showing you Government's Exhibit 12.  Can you tell us

24 what we're looking at here?

25        THE COURT:  This is actually for the record 12A.

23

1          MS. WEINSTEIN:  Oh, thank you.  Sorry.

2          THE COURT:  No problem.

3  A.   So this was a set of drawers that was found

4  underneath a workbench within the garage.

5  BY MS. WEINSTEIN:

6  Q.   Okay.  And turning to 12B, can you describe how this

7  relates to 12A?

8  A.   So that same set of drawers that was in the previous

9  photograph when you pulled out one of the drawers there

10  was a hidden compartment found within one of them.

11  Q.   And what was found within that hidden compartment in

12  the garage?

13  A.   There was a silencer and I believe other silencer

14  parts.

15  Q.   Okay.  And Exhibit 12C it's fair to say that this

16  depicts the silencer after it was placed on the toolbox in

17  the garage?

18  A.   Exactly.  It's the same that was found in the

19  previous photograph here.

20  Q.   Okay.  And this has been deemed a firearm under

21  federal law; is that correct?

22  A.   That's correct, yeah.

23          MS. WEINSTEIN:  Okay.  Government moves to admit

24  Exhibits 12A through C into evidence at this time.

25          MR. CRUZ:  No objection.

24

1          THE COURT:  Okay, admitted.

2      GOVERNMENT'S EXHIBIT NOS. 12A through 12C, ADMITTED

3  BY MS. WEINSTEIN:

4  Q.   So Agent Nagle, while agents were searching the

5  garage and discovering the items within the bar where were

6  you?

7  A.   I was in the back screened-in porch with Mr. Sartwell

8  and his wife, Jessica, was there for quite a bit of time

9  as well.

10  Q.   Okay.  And prior to you having been there or were you

11  aware of Mr. Sartwell making any statements before you

12  started talking to him?

13  A.   He was interviewed by other agents and state police

14  troopers but I was not present for that.

15  Q.   Okay.  And are you familiar with in summary fashion

16  what he had said during that time --

17  A.   Yes.

18  Q.   -- or what happened?  Okay, can you describe it to

19  the Court?

20  A.   He had stated that the, he purchased numerous airsoft

21  silencers from an application called Wish or the Wish App

22  from a cellular phone and they came almost every day.

23  Q.   Okay.  And did he mention anything about -- did he at

24  any point stop talking or mention he didn't want to talk

25  any further?

25

1    A.   He did at one point, yes.

2    Q.   And what happened, can you describe what happened at

3    that point?

4    A.   Questioning ceased at that point and the interview

5    was concluded.

6    Q.   Okay.  So while you're sitting with Mr. Sartwell

7    outside where was his wife?

8    A.   Umm --

9    Q.   On the screened in porch, sorry.

10   A.   She sat in the screened-in porch as well for the vast

11   majority of it.  She moved throughout the property from

12   time to time as well.

13   Q.   Okay.  Can you describe what happened when agents

14   were taking apart the bar?

15   A.   Jessica Sartwell had witnessed agents taking apart

16   the bar.  She came back and advised Mr. Sartwell that they

17   were doing that and he questioned why they were taking

18   apart his bar and asked if they were breaking it.

19   Q.   Okay.  And did he say his bar, meaning his own bar?

20   A.   I believe he used the term my bar, yes.

21   Q.   Okay.  And did he say anything else to you regarding

22   what the garage was to him?

23   A.   He had stated that he, that that bar was his sort of

24   first piece of furniture that he built by himself.  Stated

25   he hung up the TV first and then decided to build the bar

26

1  and later added booth sitting.

2          THE COURT:  And later added?

3          THE WITNESS:  Booth sitting.

4          THE COURT:  Booth seating, okay.  Thank you.

5          THE WITNESS:  Sorry.

6  BY MS. WEINSTEIN:

7  Q.   And did he describe what he calls that bar?

8  A.   I believe it was Monster Bar or he referenced the

9  sign Monsters Way in there as well.

10  Q.   Okay.  Agents searched the house in addition to the

11  garage, correct?

12  A.   Yes, ma'am.

13  Q.   Okay.  Going down to the basement, we're going to

14  just talk about the basement.  Can you describe what was

15  found in the basement area?

16  A.   There was computers found.  There was a mirror that

17  slid to the side and revealed a storage room and there was

18  various drawers and a safe I believe found down there as

19  well.

20  Q.   Okay.  Let's start with the computers.  It's fair to

21  say that a computer was found on and the RAM memory was

22  essentially just seized on scene?

23  A.   It was reviewed on site.

24  Q.   Reviewed on site?

25  A.   Yes, ma'am.

27

1  Q.   From that review on site can you just summarize

2  what was learned during that review by forensic agents?

3  A.   I've learned that there was recent searches under a

4  user MONST and that user had searched or visited websites

5  such as Bing.com and NBC News and shutter stock I believe

6  was another website but the URLs in those websites also

7  contained references to bump stocks.

8  Q.   Okay.  And so what were some of the searches that

9  were conducted?

10  A.   3D bump stock plans, wood bump stock, vet --

11  something about vet uses bump stock to turn something into

12  a machine gun.  I don't remember, I'm sorry, I don't know

13  it verbatim but something related to that.

14  Q.   And so this was a user with a user name of MONST; is

15  that correct?

16  A.   Yes.

17  Q.   And what were the dates of those searches?

18  A.   Those were in or around October 13th of this year.

19  Q.   And based on your training and law enforcement

20  experience, is there any reason to own or use a bump stock

21  if it's not going to be for a weapon?

22  A.   Not that I'm aware of, no.

23  Q.   Okay.  Can it be used for an airsoft?

24  A.   It may be attached, but I don't know if it would be,

25  if it would work as it's intended.

28

1   Q.   So you mentioned also a mirrored room.  Putting in

2   front of you Exhibit 13A, it's fair to say that this is

3   the front of that purported mirror room; is that correct?

4   A.   Yes, ma'am.

5   Q.   Okay.  And so 13B is when you slide that mirror over;

6   is that correct?

7   A.   That's correct.

8   Q.   And what did that lead to?

9   A.   There was a, from what I understand, I actually never

10  saw it myself, there was a sort of storage area in there

11  and then within the storage area, which you can see some

12  of it in the photo, there's also a pegboard and the

13  pegboard you can slide away as well and there was a safe

14  found behind that.

15  Q.   Okay, so 13C shows the overall storage area, correct?

16  A.   Yes.

17       MS. WEINSTEIN:  Okay, government moves to admit

18  this as Exhibit 13.

19       MR. CRUZ:  No objection.

20       THE COURT:  Okay, admitted.

21  GOVERNMENT EXHIBIT NO. 13, ADMITTED

22  BY MS. WEINSTEIN:

23  Q.   Putting in front of you Exhibit 14A, can you describe

24  where in that mirrored room that's located?

25  A.   I believe that is the safe that was found behind the

29

1   slide away or hideaway peg board.

2   Q.   And 14B, can you describe what we're looking at here?

3   A.   Yes, those were some items that were found within it.

4   I believe that's a, I apologize, it's tough to see the

5   photo here at this angle, but --

6        THE COURT:  Can you just speak up a little.

7   A.   Yes.  I apologize, I can't see the photo too well,

8   but I believe there are, I believe that the bottom item is

9   a starter pistol but again it's hard to see.

10       MS. WEINSTEIN:  If I may approach the witness,

11  Your Honor?

12       THE COURT:  Yes.

13  A.   Okay, yeah.

14  BY MS. WEINSTEIN:

15  Q.   Okay.

16  A.   I can't remember if these were airsoft guns, blank

17  guns, but they weren't firearms.

18  Q.   Okay.  Let's look at 14C.  Can you tell us what we're

19  looking at in 14C.  You have it in front of you as well if

20  it's easier with the lighting.

21  A.   Yeah.  These are baffles that are found within a

22  firearm silencer and can be considered a firearm silencer

23  themselves.

24  Q.   Okay.  What's this plastic thing that says AR-10 on

25  it?

30

1  A.   That's a drill bit guide that can be used in

2  conjunction with a power tool.

3  Q.   Okay.  And is it used for something specific as it

4  relates to creating firearms?

5  A.   Yes, we believe it's used in the creation of

6  firearms.

7  Q.   Okay.  How about 14D?

8  A.   That was an instruction manual in how to create a

9  firearm.

10  Q.   Okay.  And 14E?

11  A.   I believe that's a part of the same piece of paper in

12  the previous photo.  I think it's just the second page.

13  Q.   Okay.  So it's about creating your own firearms; is

14  that correct?

15  A.   Correct, from a company called R&B Tactical Tooling.

16         MS. WEINSTEIN:  Okay, government moves to admit

17  this as Exhibit 14.

18         MR. CRUZ:  No objection.

19         THE COURT:  Admitted.

20     GOVERNMENT EXHIBIT NO. 14, ADMITTED

21  BY MS. WEINSTEIN:

22  Q.   Agent Nagle what happened when they went upstairs to

23  the bedroom?  What was recovered?

24  A.   There was additional items recovered, namely 556

25  ammunition that was found in a bedside table among some

31

1  other items.

2  Q.   Okay.  Putting up Exhibit 15A, can you describe --

3  are you aware of how, where within this bedside table

4  ammunition and other items were found and how they were

5  found?

6  A.   I believe it was a slide away or a hideaway for the

7  compartment within the bedside table.

8  Q.   Okay.  And it was located by a canine; is that

9  correct?

10  A.   I believe there was a canine indication, but I know

11  agents or officers sort of found it.

12  Q.   Okay.  So in, in the master bedroom, Government's

13  Exhibit 15A depicts the drawer that had a hide; is that

14  correct?

15  A.   Correct.

16  Q.   15B what are we looking at?

17  A.   That's the 556 ammunition referenced.

18  Q.   Can you describe what 556 ammo is?

19  A.   556 is the caliber or the size of it and it's

20  described as a high velocity rifle ammunition round.

21  Q.   Okay.  And it was a box labeled a 150; is that right,

22  but it contained 153 rounds?

23  A.   I don't remember the exact number.  I thought it was

24  130, but, or actually it could have been 153, but it was

25  somewhere between 100 and 200.  I don't know the exact

32

1   number.

2   Q.   Okay.   It's fair to say that there is the test fire,

3   going back to the test fire, the test fire was done on

4   October 31st by Special Agent Scott; is that correct?

5   A.   Correct.

6   Q.   Of the gun that was found in the garage; is that

7   right?

8   A.   Yes.

9   Q.   To conduct that test fire, where did Special Agent

10  Scott get the ammunition?

11  A.   He used ATF ammunition for that.

12  Q.   It's fair to say that he used the ammunition that he

13  actually in fact seized from the home; is that correct?

14  A.   I would have to review that report again.

15  Q.   Oh, one moment.

16  A.   It may have been the same caliber, but I don't think

17  it was the identical.

18  Q.   I apologize.   It's fair to say that he used 556

19  ammunition that was taken from the, looking at

20  Government's Exhibit 9, three rounds of 556 caliber

21  ammunition that was taken from the test fire ammunition

22  inventory from Bridgewater Field Office; is that right?

23  A.   Yes, ma'am.

24  Q.   So he used the same ammunition, the same caliber

25  ammunition that was found in Mr. Sartwell's bedroom

33

1  drawer; is that correct?

2  A.   That is correct.

3  Q.   And those successfully test fired; is that correct?

4  A.   Yes.

5  Q.   In addition to Exhibit 15B, looking at 15C can you

6  tell us what we're looking at and where this was?

7  A.   That's a Taser.  I believe it was found in the same

8  bedside table.

9  Q.   15D?

10  A.   That's a starting gun or a blank gun that doesn't

11  fire a projectile.  Also found in the same area.

12  Q.   Okay.  15E?

13  A.   I believe that's a black powder gun.  It's considered

14  an antique and not a firearm by law.

15  Q.   And because it's not a firearm it was not seized; is

16  that correct?

17  A.   That's correct.

18  Q.   But although this one wasn't fired, it still is

19  capable of being operable and firing, discharging

20  something; is that correct?

21  A.   Those types of guns can fire a projectile, but I

22  couldn't tell you if that one specifically is operable.

23  Q.   Okay.  How about 15F?

24  A.   Brass knuckles.

25  Q.   And that was also found in that bedroom drawer?

34

1    A.    Yes, ma'am.

2    Q.    And 15G?

3    A.    Those are pistol magazines to hold ammunition.

4    Q.    Okay.  And those also were found in the bedroom,

5    correct?

6    A.    Correct.

7            MS. WEINSTEIN:  Government moves to admit this

8    as Exhibit 15.

9            MR. CRUZ:  No objection.

10            THE COURT:  Okay, so admitted.

11          GOVERNMENT'S EXHIBIT NO. 15, ADMITTED

12    BY MS. WEINSTEIN:

13    Q.    You mentioned black powder rifles or guns.  Were

14    there other black powder guns found in the house?

15    A.    Yes.  There were at least two black powder rifles.

16    Q.    Okay.  Putting up Government's Exhibit 16A and 16B,

17    fair to say that these were found in the bedroom closet;

18    is that correct?

19    A.    Correct.

20    Q.    Okay.  And these were not seized; is that right?

21    A.    That's correct.

22            MS. WEINSTEIN:  Okay, government moves to admit

23    this as Exhibit 16.

24            MR. CRUZ:  No objection.

25            THE COURT:  Okay.

35

1      GOVERNMENT'S EXHIBIT NO. 16, ADMITTED

2  BY MS. WEINSTEIN:

3  Q.   And putting up for you Exhibit, Government Exhibit

4  17, fair to say that this is an inventory of the items

5  that were seized from Mr. Sartwell's home on October 30,

6  2019, correct?

7  A.   Yes, ma'am.

8          MS. WEINSTEIN:  Government moves to admit this

9  as Exhibit 17.

10          MR. CRUZ:  No objection.

11          THE COURT:  Okay, so admitted.

12      GOVERNMENT'S EXHIBIT NO. 17, ADMITTED

13  BY MS. WEINSTEIN:

14  Q.   And so this lists the item, a serial number if there

15  was one and the general location as to where those items

16  were located; is that right?

17  A.   Yes.

18  Q.   Okay.  So listed on here in addition to a bunch of

19  the items that we've talked about that were found in the

20  garage, there's a drill press, a Dremel polisher, pre-

21  drilled rifle barrel.

22      Can you describe the significance of finding these

23  items in a location where a ghost gun is found?

24  A.   Those are parts and tools that could be used to

25  create or manufacture a firearm.

36

1   Q.   Okay.  Have you had, prior to today's date, have

2   you had the opportunity to review the Board of Probation

3   record and the state record of Mr. Sartwell?

4   A.   Yes.

5   Q.   Okay.  Talking about the out-of-state record, are you

6   familiar with charges that he has out of court with Maine

7   and, if so, can you describe generally what those are?

8   A.   I believe he was charged with aggravated assault in

9   Portland, Maine.

10  Q.   Okay.  And he was convicted of that; is that correct?

11  A.   I believe he was found guilty, yes.

12  Q.   Okay.  And are you aware of a prior conviction out of

13  Suffolk Superior Court as well?

14  A.   Yes, ma'am.

15  Q.   Putting on the overhead Government's Exhibit 18 which

16  is a copy of a Mass. court's docket for Mr. Sartwell

17  related to his conviction for his prior conviction.

18  You're aware that this documents the prior conviction out

19  of Suffolk Superior, correct?

20  A.   Yes.

21       MS. WEINSTEIN:  Government moves to admit this

22  as Exhibit 18.

23       MR. CRUZ:  Your Honor, with regard to this

24  particular exhibit, I would suggest that the information

25  provided in the pretrial services report likely covers

37

1  this information so I just question the relevance of

2  this particular exhibit.

3          THE COURT:  Well, sure.  I agree with you.

4  I'll, it can be admitted.  I'll admit it but I hear you.

5          MS. WEINSTEIN:  Thank you, Your Honor.

6          THE COURT:  Okay.

7      GOVERNMENT'S EXHIBIT NO. 18, ADMITTED

8  BY MS. WEINSTEIN:

9  Q.   The indictments attached related to a charge for

10  which the defendant was convicted of assault and battery

11  by means of a dangerous weapon, what was that dangerous

12  weapon?

13  A.   A piece of rock.

14  Q.   Okay.  And have you had the opportunity to review a

15  prior police report out of Brockton police department?

16  A.   Yes, I have.

17  Q.   And that relates to an extortion charge that was

18  later dismissed; is that correct?

19  A.   Yes, ma'am.

20  Q.   Putting on the overhead Government's Exhibit 19, is

21  this that report?

22  A.   Yes.

23  Q.   Okay, and you've reviewed the content of this report

24  previously. Correct?

25  A.   I have.

38

1      MS. WEINSTEIN:  Government moves to admit this

2  as the next, as Exhibit 19.

3      MR. CRUZ:  I'm going to raise the same

4  objection, Your Honor, with regard to the previous

5  exhibit.  That incident is I believe over 20 years old and

6  this particular situation is at least 10 years old.  The

7  Court has reference to this in the pretrial services

8  report.

9      THE COURT:  Okay.  So I'll admit this, but I

10  understand the age of it, et cetera.

11      MS. WEINSTEIN:  Okay.  Thank you, Your Honor.

12      GOVERNMENT'S EXHIBIT NO. 19, ADMITTED

13  BY MS. WEINSTEIN:

14  Q.   So Agent Nagle, just in sum, there was the silencer

15  in the package, correct?

16  A.   That's correct.

17  Q.   The silencer parts that were found in the safe that

18  would be deemed a firearm; is that correct?

19  A.   That's correct.

20      THE COURT:  I'm sorry, so there's two silencers

21  that are each considered firearms under the statute?

22      MS. WEINSTEIN:  Correct.

23      THE COURT:  And what was the next thing you were

24  saying?

25  BY MS. WEINSTEIN:

39

1   Q.   The silencer parts inside the safe that's

2   considered silencer under federal, that's considered a

3   firearm under federal law as well?

4   A.   That's how it's been described to me, yes.

5           THE COURT:  Just -- so in the safe there are

6   parts of a silencer?

7           MS. WEINSTEIN:  That are deemed to be firearm

8   pursuant to the report --

9           THE COURT:  Okay.

10          MS. WEINSTEIN:  -- that was provided.

11  BY MS. WEINSTEIN:

12  Q.   And the AR-15 styled rifle found hidden inside Mr.

13  Sartwell's bar; is that correct?

14  A.   Yes, ma'am.

15  Q.   Okay.  Did you have any further conversation other

16  than him referencing that this was his bar with him?

17  A.   Yeah.

18  Q.   And what was that generally?

19  A.   Talked about all sorts of things.  Discussed

20  Halloween coming up and he was eating donuts and drinking

21  milk.  We discussed that a little bit but mostly innocuous

22  items.

23  Q.   Okay.  And on the overall whole, can you describe

24  how, each of your respective demeanors during the course

25  of that conversation?

40

1   A.   It was overall relaxed and a relatively pleasant

2   conversation, or I wouldn't call it a conversation I guess

3   but just sort of interaction.

4           MS. WEINSTEIN:  One moment, Your Honor.

5   PAUSE

6           MS. WEINSTEIN:  I have nothing further of the

7   witness, Your Honor.

8           THE COURT:  So I have a couple questions.  The

9   aggravated assault out of Portland, Maine the pretrial

10  service report says that it's unknown.  How do you know

11  the result of that?

12          THE WITNESS:  I read some sort of police report

13  or judgment that referenced the term guilty.  I don't know

14  what --

15          THE COURT:  Okay.

16          THE WITNESS:  -- which it was though.

17          THE COURT:  Okay.

18          MS. WEINSTEIN:  Thank you.

19          THE COURT:  Yes.

20                    CROSS EXAMINATION

21  BY MS. THRALL:

22  Q.   Good morning.

23  A.   Good morning.

24  Q.   So I want to, I want to circle back about a piece of

25  information that I'm I guess a little, still a little bit

41

1  unclear about.  The, the silencer that was actually

2  delivered in the packaging, is it your testimony that that

3  has been determined to be a firearm under federal law?

4  A.   Yes.

5  Q.   Okay.  And can you maybe talk a little bit more about

6  who made that determination and when?

7  A.   So when we received it as agents with HIS we took

8  custody of it from CBP.  We then invited an ATF agent to

9  come to our office.  We opened the package with him

10  present.  He took photographs, took some measurements and

11  then ATF has a, FTB is the acronym but it's a technology

12  branch, firearms technology branch.  That agent sent

13  photos and spoke to that, enforcement officer I think is

14  their title, on the phone and that individual made the

15  official determination that it was a silencer under law.

16  Q.   Okay.  And that is in comparison to the airsoft

17  silencers that you were asked some questions about as

18  well, right?

19  A.   Yes.  From what I understand there's a different

20  style of -- yeah.

21  Q.   Okay.  You were also testifying about information

22  about the order about the name fuel filter --

23  A.   Yes.

24  Q.   -- on the order --

25  A.   Yeah.

42

1   Q.    -- that was originally -- can you talk a little bit

2   more about that?

3   A.    So when the seized silencer that came in the mail was

4   manifested with customs, it was manifested and declared to

5   contain fuel, a fuel filter.

6   Q.    Meaning the label said fuel filter?

7   A.    Correct.  There's a customs declaration that goes on

8   the package that the sender then filled out fuel filter on

9   it.

10  Q.    Okay.  And I guess that's the point of my questions

11  is it's the sender who identified it as a fuel filter,

12  right?

13  A.    Yes, ma'am.

14  Q.    Not Mr. Sartwell?

15  A.    No.  Not, best of my knowledge, no.

16  Q.    Okay.  And when you were doing the search of the

17  computer that was seized, was there any information on the

18  computer about the purchase, the sort of electronic

19  purchase of that particular item?

20  A.    So there are computer forensic agents that have been

21  assigned to analyze all the electronics that have been

22  seized.  That analysis has not been completed yet, but

23  there was just on the computer that was turned on a site,

24  onsite survey or examination of that computer where they

25  can only pull limited information.

43

1  A.    I understand.

2  Q.    And that's the limit, the only information that they

3  pulled is what I described in my earlier testimony so I

4  couldn't tell you anything more about the, what else they

5  may find in the future regarding the purchase.

6  Q.    Okay.  But as we know now you don't have any

7  information about the nature or circumstances of that

8  particular purchase, right?

9  A.    That's correct.

10 Q.    Okay.  And you know you were shown a lot of pictures

11 of a lot of guns, right.  The vast majority of the items

12 in those pictures that look like firearms are actually

13 airsoft games, right?

14 A.    Yes, ma'am.

15 Q.    Okay.  And so I think, well I think what the Court

16 was trying to narrow your testimony about is which one of

17 those things is actually an illegal firearm, right, --

18 A.    Mmm-hmm.

19 Q.    -- according to the federal government at this point.

20 And so I think that those things are the item that was

21 delivered, right?

22 A.    Correct.

23 Q.    The pieces of silencers that were found inside the

24 home, right?

25 A.    Correct.

44

1   Q.   And the, well I guess what you're describing as a

2   ghost gun, right?

3   A.   Correct, and then there was an additional completed

4   silencer as well.

5   Q.   Okay.  And where was that found?

6   A.   That was the silencer that was found on the drawer,

7   the chest of drawers in the garage that I had originally

8   described was found and then moved to the toolbox.  So

9   that was a completed silencer.

10  Q.   And is that the one with, where it's sort of a red

11  background in the picture?

12  A.   Correct.  The toolbox is red.

13  Q.   Yup.  And would a silencer normally have holes in it?

14  A.   Holes in it?

15  Q.   Yeah.

16  A.   Sure.

17  Q.   Okay.  And does this, the item depicted here does

18  this have any holes in it besides the one over here?

19  A.   I don't know, I didn't inspect it, but I know that a

20  determination was made by ATF that it was.

21  Q.   Okay.  Somebody at the --

22              THE COURT:  That it was?

23              THE WITNESS:  A silencer.

24              THE COURT:  A silencer.

25              THE WITNESS:  I'm sorry.

45

1   BY MS. THRALL:

2   Q.   Okay.  During the course of your investigation into

3   Mr. Sartwell, did you learn that he actually owns the home

4   that you were searching?

5   A.   Yes, public record showed that.

6   Q.   Okay.  And did you determine that before you went to

7   execute the search warrant?

8   A.   Yes, we did.

9   Q.   Okay.  And you also were able to determine that he

10  lives in that home with his wife and his children, right?

11  A.   Yes, we believe so.  There was indications of that,

12  yes.

13  Q.   Okay.  And were there any kids in the house at the

14  time that you came to search?

15  A.   No, ma'am.

16  Q.   And were you also able to learn that he is employed

17  and actually owns his own business in Brockton, right?

18  A.   Yes.

19  Q.   A tattoo parlor?

20  A.   Correct.

21  Q.   Okay.  Now, I believe that you were describing your

22  interactions with Mr. Sartwell during the execution of the

23  search warrant as being sort of conversational or

24  pleasant?

25  A.   Correct.

46

1  Q.   Fair to say?

2  A.   Yes.

3  Q.   Okay.  He certainly didn't resist in any way, right?

4  A.   No, ma'am.

5  Q.   He did not seek to flee in any way?

6  A.   No, ma'am.

7  Q.   Fair to say that he was professional and cordial with

8  all of the police personnel who were there that day?

9  A.   Yes, ma'am.

10  Q.   As was his wife?

11  A.   Yes.  She was angry to start but she cooled down.

12  Q.   That's probably a pretty common reaction in your job?

13  A.   Very understandable, yes.

14  Q.   Okay.

15          MS. THRALL:  Could I have a moment, Your Honor?

16  PAUSE

17          MS. THRALL:  Nothing further, Your Honor.

18          MS. WEINSTEIN:  Just one, a couple of follow

19  ups.

20                    REDIRECT EXAMINATION

21  BY MS. WEINSTEIN:

22  Q.   That onsite survey, the computer, can you describe

23  what was the purpose of doing an onsite survey of a

24  computer that was on?

25  A.   I know there's decisions made by forensic agents as

47

1  to when's the best possible time to retrieve

2  information, but I couldn't speak anything further to

3  that.

4  Q.   And, but you're aware that the purpose of it was to

5  freeze any recent activity before they turned it off and

6  subsequently took it to do an offsite survey; is that

7  right?

8  A.   That's correct.  So as it was described to me the RAM

9  that they were searching or analyzing onsite is what's

10  captured since the last restart of that computer, so I

11  guess that's why they made a decision, I don't know.

12  Q.   Okay.  So there's search terms in the week of October

13  13th related to bump stocks which are illegal; is that

14  correct?

15  A.   Yes, ma'am.

16  Q.   And the search, the name of the person doing the

17  search is, was essentially Monster without the ER; is that

18  right?

19  A.   That's correct.

20  Q.   Okay.  And Special Agent Scott on scene had the

21  opportunity to analyze, assess the silencer part, the

22  silencers that were found both in the hide in the dresser

23  and garage and also he has also deemed the silencer found

24  in the fuel filter package to be a silencer as well; is

25  that right?

48

1   A.   Correct.

2   Q.   Okay.  And all of this is detailed in Government's

3   Exhibit 9, the ATF reports; is that right?

4   A.   Yes, ma'am.

5         MS. WEINSTEIN:  Nothing further.

6         MS. THRALL:  Very quickly, Your Honor.

7         THE COURT:  Sure.

8                    RECROSS EXAMINATION

9   BY MS. THRALL:

10  Q.   And with respect to that computer that was searched

11  on scene, there was no separate search warrant for that

12  computer, right?

13  A.   No.

14        THE COURT:  Okay, I have a couple questions.

15        Well, if you don't mind just remaining there.

16  So I just would like to ask the government in the

17  complaint there is information about an active and ongoing

18  feud concerning a motorcycle gang that Mr. Sartwell is

19  allegedly president of.

20        MS. WEINSTEIN:  Yes, Your Honor.

21        THE COURT:  And do you want the Court to

22  consider that as part of the detention issue?

23        MS. WEINSTEIN:  Yes, Your Honor, which is why I

24  moved to admit the complaint as an exhibit.

25        THE COURT:  Okay.  So do you know anything about

49

1    the so called feud?

2           THE WITNESS:  Nothing that isn't included in the

3    complaint, Your Honor.  I don't know anything further.

4           THE COURT:  Okay.  And I have to confess I don't

5    really know that much about motorcycle gangs.  Is it

6    illegal to be a member of a motorcycle gang?

7           THE WITNESS:  I'm also not incredibly familiar

8    with motorcycle gangs but, no, I don't believe just your,

9    your membership is against the law.

10           THE COURT:  Okay.  Because the complaint says

11    the gangs utilize violence, fear and intimidation to

12    impose their will, make money and protect criminal

13    enterprises.

14           Do you have any details about that with regard

15    to Mr. Sartwell's involvement with the gang?

16           THE WITNESS:  No, I don't.

17           THE COURT:  I mean the motorcycle club?

18           THE WITNESS:  I don't have anything further, no,

19    ma'am.

20           THE COURT:  Okay.  And it also says law

21    enforcement is aware that the Outlaws and Hells Angels are

22    involved in a violent feud with one another.  Is that – I

23    mean do you know anything about that relating to Mr.

24    Sartwell?

25           THE WITNESS:  No, not directly to him.

50

1          THE COURT:  Okay.  And it references a murder

2    that occurred or a charged murder on September 13th where

3    an Outlaws member ended up confronting another Club, Clubs

4    member and someone, other clubs member, the Sidewinder

5    member, was killed?  Is there any connection at all with

6    Mr. Sartwell with that?

7          THE WITNESS:  The only connection I know is that

8    the individual that was arrested for that murder, his

9    father is an associate of Mr. Sartwell's, but I don't know

10   their relationship or anything additional.

11         THE COURT:  And when you say his father is an

12   associate of that person, is his father also in the

13   motorcycle club?

14         THE WITNESS:  That's my understanding, the

15   Outlaws.

16         THE COURT:  Okay.  And is there any reason, any

17   kind of innocent reason to buy body armor?

18         THE WITNESS:  You can purchase body armor for

19   self-protection.  I believe that certain individuals are

20   prohibited from purchasing it.

21         THE COURT:  Okay.  And as far as you know the

22   purchase of the body armor was not illegal?

23         THE WITNESS:  That I don't know.  Not that I am

24   aware of, ma'am.

25         THE COURT:  And a bump stock I just know, I've

51

1    heard of it because of the Las Vegas incident but can

2    you just explain for the record what a bump stock is?

3              THE WITNESS:  So again I'm not a forearms expert

4    but from what I understand a bump stock is used, a rifle

5    stock was described in one of the photos earlier and this

6    bump stock uses the inertia of the recoil of a firearm to

7    sort of create what would be a semiautomatic rifle into an

8    automatic rifle so it sort of bumps or bounces off of the

9    rifle and continues to fire and they've recently been

10   deemed illegal.

11             THE COURT:  And the gun that was found, the one

12   gun was an AR-15 style gun?

13             THE WITNESS:  Yes.

14             THE COURT:  And can you just explain what is

15   that gun?

16             THE WITNESS:  It's a rifle that I believe under

17   its current configurations semiautomatic so one pull of

18   the trigger equals one live round being fired, but it's a

19   rifle.  It's described as a short barrel rifle due to the

20   fact that it's I think roughly I think the report

21   references eight and three quarters length and overall

22   length of something like 24 inches.  So it's a short

23   barrel rifle that shoots rifle ammunition.

24             THE COURT:  And was the gun that was, this gun

25   that we're speaking about that was found was it

52

1    substantially built?

2              THE WITNESS:  There were markings that it had

3    been drilled and completed so therefore an 80% -- the

4    pieces that were previously considered 80% had been

5    drilled out and milled out and were there, therefore able

6    to fire live ammunition and was an operable firearm.

7              THE COURT:  So it was actually only 80% built?

8              THE WITNESS:  So from what I understand you can

9    purchase what are called 80% guns, guns that are or

10   firearms that are 80% of the way to being a firearm.

11             THE COURT:  So --

12             THE WITNESS:  And those are legal to sell.

13             THE COURT:  And they don't need assembling?

14             THE WITNESS:  So they would not actually fire --

15   - 80% guns don't, from what I understand, again, I'm not a

16   firearms expert, from what I understand and what I've been

17   told, an 80% gun is not going to fire anything, it's not

18   going to shoot a live round.  There needs to be some work

19   done to it with a drill press, with different power tools

20   to mill out different sections within this 80% piece to

21   fully complete the firearm and therefore make it an

22   operable firearm that can shoot ammunition.  And it's my

23   understanding from the ATF report that those, there are

24   tool markings that indicate that there was drilling done

25   to it and therefore, and because of the successful test

53

1   fire, it is now a firearm that can, that is considered a

2   firearm under the NFA.  So what was once an 80% just piece

3   of metal and polymer and other pieces has been drilled and

4   milled to now create a hundred percent firearm that shoots

5   live ammunition.

6           THE COURT:  And you're saying that was the state

7   of the gun that was found was it would shoot ammunition?

8           THE WITNESS:  Yes, it did shoot.  It did shoot,

9   yes, in the test fire.

10          THE COURT:  And where does one acquire the 80%

11  gun?

12          THE WITNESS:  I think you can buy them from

13  various sources online or in person.  What we found during

14  our search a company called R&B Tactical Tooling that I

15  think they sold the parts to actually mill it, but I don't

16  know specifically like the drill bits that would mill it,

17  but I don't know if we know where the larger upper and

18  lower receivers were purchased.

19          THE COURT:  And perhaps it was not purchased out

20  of state?

21          THE WITNESS:  That I don't know.

22          THE COURT:  And you found some information that

23  this particular one came from a certain R&B, is that what

24  you said?

25          THE WITNESS:  I believe we found that the tools

54

1   made to create it or to complete it were from R&B

2   Tactical which I believe is headquartered from their

3   website in the San Bernardino area of California.

4           MS. WEINSTEIN:  Your Honor, if I may,

5   Government's Exhibit 14E --

6           THE COURT:  Yes.

7           MS. WEINSTEIN:  -- references the, it's

8   essentially the guide to creating an 80% lower receiver

9   that was found inside the safe in the mirrored room in the

10  basement.  It references, it's a guide that describes how

11  it is then created into a firearm that is deemed a firearm

12  under law and can successfully fire bullets.

13          THE COURT:  Okay.  And is there any other use

14  for these tools that you found, the milling equipment, et

15  cetera?

16          THE WITNESS:  Absolutely.  You could use it for

17  other reasons, yes.

18          THE COURT:  What kinds of things?

19          THE WITNESS:  I mean, drill presses and Dremels

20  could be used for all sorts of machining and, you know,

21  legal things, activities.

22          THE COURT:  Okay.  Okay, any other questions?

23          MR. CRUZ:  No.  Thank you, Your Honor.

24          MS. WEINSTEIN:  No, Your Honor.

25          THE COURT:  Okay.  Thank you very much.

55

1          THE WITNESS:  Thank you.

2    WITNESS, excused.

3          THE COURT:  I just want to say before I hear

4    from the parties I did get a revised financial affidavit,

5    thank you very much, from Mr. Sartwell, and I'm still

6    appointing counsel.

7          MR. CRUZ:  Thank you, Your Honor.

8          THE COURT:  So it just, it has a little more

9    detail and I noticed that he also provided that same

10   information to probation during the interview.

11         So any argument on probable cause?

12         MS. WEINSTEIN:  Your Honor, I am asking the

13   Court to find probable cause based upon the complaint that

14   has issued, the items that were discovered not necessarily

15   just detailed in the complaint but also detailed in the

16   testimony of Agent Nagle and also in the report of the ATF

17   agent, Government's Exhibit 9, outlining that the AR style

18   15 rifle in fact fired live rounds of ammunition.  It was

19   deemed a short-barreled rifle and was in violation of

20   5861(d) and therefore the complaint was issued based upon

21   adequate probable cause.  So for that argument I'd ask the

22   Court to consider the exhibits and the complaint as well.

23         THE COURT:  Okay.  Any argument?

24         MS. THRALL:  No.

25         MR. CRUZ:  No, thank you, Your Honor.

56

1          THE COURT:  Okay, so I'm going to find

2    probable cause, and I just have a couple questions for the

3    government.  So what, I know that Mr. Sartwell is

4    presently charged with unlawful possession of a firearm

5    not registered to him under the National Firearm

6    Registration Transfer Record.  And are you anticipating

7    further charges?

8          MS. WEINSTEIN:  Yes, Your Honor.

9          THE COURT:  And what might those be?

10          MS. WEINSTEIN:  There would be I anticipate at

11    least three additional charges.  So he's currently charged

12    now with what had been deemed the ghost gun, essentially

13    the AR-15 rifle under 5861(d).  At the present time, I do

14    anticipate him being charged with three additional

15    firearms weapons that were found within the home or on the

16    property; one being the package that was delivered that he

17    signed for.  It was addressed to him and he himself

18    admitted that he orders these types of items all the time.

19    The other being the silencer found in the hide inside of

20    the drawer in the garage where Monsters Bar is and also

21    silencer parts found within the mirrored room.  So that

22    would be a total of four firearm charges.  I am looking

23    into additional charges related to concealment of imported

24    items under 18 U.S.C. 545, but I am awaiting the forensics

25    from the defendant's cellphone, the computers, for which

57

1   the search warrant permitted searches for and other

2   items related to that, and also anticipating the potential

3   charge of felon in possession of a firearm and ammunition.

4            THE COURT:  And do you have any idea at the end

5   of the day what the guideline range is?

6            MS. WEINSTEIN:  Very prelim I calculated it at a

7   range of 41 to 51 but that was very prelim.  I haven't

8   factored in -- that was just based upon the four items

9   found in the house and four counts of 26 U.S.C. 5861(d) so

10  it's not factoring in the other details.  So that was my

11  very prelim range.

12           THE COURT:  And do you have anything to add

13  about, I mean you made representations in the complaint

14  about the motorcycle gang and a feud brewing and all of

15  this.  Anything to add to that?

16           MS. WEINSTEIN:  I think the complaint speaks for

17  itself.  Those are in April of this year and then

18  September of this year there were disputes.  The one in

19  September of this year involved an individual who is

20  associated with a gang of which the defendant himself is

21  the president of being charged with murder of a rival

22  gang, a Hells Angels member.  I think the fact that

23  displayed within photographs in a sum, are items related

24  to his membership and his active role in supervising that.

25           THE COURT:  What do you mean his active role in

58

1  supervising?

2       MS. WEINSTEIN:  Essentially, Your Honor, he -- I

3  would argue to the Court that he is a self-proclaimed

4  president of this motorcycle gang.  This motorcycle gang

5  has been in a very active feud as referenced in the

6  complaint from both -- where there is a fight that almost

7  happened at a mixed martial arts arena and the murder that

8  happened in September resulting in search warrants

9  executed on Hells Angels members and Outlaws members and

10 the charging of an Outlaws member for that exact thing.

11 Two weeks later agents from HIS get notified that, by CBP

12 that the defendant is about to accept, has imported a

13 package labeled as a fuel filter that can only be used as

14 a firearm's silencer used for firearms.  So the inherent,

15 and the items that he is receiving both by his admissions

16 and by the summary within the reports, this is an

17 individual who I would submit to the Court is stocking up

18 weapons.  So I think within that --

19       MR. CRUZ:  I'm going to object to that, Your

20 Honor.  I mean this is total speculation.

21       THE COURT:  I mean she can argue it.  So he's

22 stalking up weapons because he ordered silencers, he has

23 parts for a silencer and another silencer and he has this

24 AK-15 in his --

25       MS. WEINSTEIN:  AR-15.

59

1              THE COURT:  AR-15 in his --

2              MS. WEINSTEIN:  That he built.

3              THE COURT:  That he built.

4              MS. WEINSTEIN:  Correct.  So essentially, Your

5    Honor, what I would argue to the Court is I've moved for

6    detention on two different grounds.  I've moved for

7    detention under risk of flight and also under a danger to

8    the community.  I recognize this is not the classic risk

9    of flight case.  The only alias he has is one that he

10   wears tattooed on his neck so it's not as if this is a

11   situation where a man who is ground in the community, he

12   has family and roots and works in the community, is one

13   who is going to flee despite having had a large range of

14   international travel and a lot of family located across

15   the country.  I recognize that.  This is an

16   extraordinarily strong case for the government though and

17   because of that and he, because the guideline range that

18   he is facing and the penalties he is facing and the

19   likelihood of incarceration based upon that, he is a risk

20   of flight inherent within that.

21              That brings us to why is he actually in fact

22   what I think is the stronger and more significant concern,

23   this man poses a danger to the community.  As the Court as

24   seen through the testimony and the photographs that have

25   been presented and the reports that have also been

60

1   presented within his home, his garage that he's deemed

2   his bar, his area, Monsters Way, on display are fake

3   weapons designed to intimidate but hidden are weapons

4   designed to kill, and I cannot imagine any conditions that

5   we can ensure the safety of the community by releasing a

6   man to the very home where he is building these weapons.

7   The workshop that he set up, the bar that he had set up,

8   but for a canine knocking on that wall that he

9   deliberately hid an AR-15 with two magazines designed to

10  hold 30 rounds each, but for that dog agents might not

11  have discovered that.  So he is hiding the items that he

12  knows are illegal.  He's hid the silencer in a hidden hide

13  in a drawer within the garage.  He his silencer parts

14  deemed weapons inside a safe behind a corkboard behind a

15  bureau inside a hidden room disguised by a sliding mirror.

16  This is a man who's deliberately hiding the items to use,

17  used to kill individuals and items that are also used to

18  build these items as well from his family, the public, et

19  cetera.

20          In addition to that though, Your Honor, other

21  than the weapons that are deemed illegal, he has multiple

22  black powder rifles that were in his house which can still

23  possibly be operable.  They didn't test them because

24  they're antiques.  You saw photographs of Tasers,

25  cartridges, brass knuckles, other items that are used to

61

1   pose a danger and for this man to intimidate others

2   around him.  There's been a report that has been

3   presented.  I recognized it was related to a discussed

4   case from close to 10 years ago from Brockton police

5   department where an individual is looking to open up a

6   tattoo parlor also in Brockton and the defendant who is

7   flashing his Outlaws motorcycle jacket said, no, this is,

8   we already have one here.  So to the extent that the man,

9   I recognize he does not have a recent record, but I think

10  inherent in that report and the threatening nature of

11  those charges that have issued for extortion and threats

12  is an individual who is so grounded in the community, that

13  he is feared by people around him and so I, to the extent

14  that there are conditions of release I don't know what

15  they would be.  The Court -- he's clearly working.  He

16  clearly has family ties to the community and he clearly

17  has a stable residence in which he lives with his family;

18  however, from that, when he's working he's threatening

19  people to not open up a competitive shop and from his very

20  own home he's building assault rifles with equipment that

21  he's either importing from China or getting elsewhere.  So

22  to allow him to be released, to allow him to go even under

23  house arrest, it just would give him more time to do the

24  dangerous activities he's already engaged in.

25              So for all of these reasons I would proffer his

62

1   record for the Court, and I would also proffer the

2   reasons and the agreement with probation for a

3   recommendation of detention, I'd ask you to detain him.

4              THE COURT:  Mmm-hmm.  And is your, was the

5   guideline range you said, is that before acceptance, the

6   44 --

7              MS. WEINSTEIN:  I don't remember.  It was the

8   furthest over column.  I don't have my guide --

9              THE COURT:  Okay.

10             MS. WEINSTEIN:  I apologize.

11             THE COURT:  No problem.  No problem.  Okay, I'll

12   hear you.

13             MR. CRUZ:  Yes, Your Honor.  Your Honor, with

14   regard to -- I think the government's strongest argument

15   here, if you want to call it strong, is with regard to the

16   danger to the community prong of the bail statute.  I

17   don't think anyone in this courtroom disagrees that this

18   man certainly is not a risk of flight.  He has a business

19   locally that he's run for many years.

20             THE COURT:  So I don't really think you have to

21   argue risk of flight cause I wouldn't find that he's a

22   risk of flight.

23             MR. CRUZ:  Thank you, Your Honor.

24             THE COURT:  But I'll just say it's really

25   disturbing, even if the government hasn't really fleshed

63

1   out for whatever reason the gang, the club issue and I,

2   I don't, I don't think it's illegal to be a member of a

3   motorcycle club obviously, but if there is something

4   happening that law enforcement is aware of and then their

5   attention is drawn to this person who has I mean not only

6   the, this weapon but a ton of ammunition too and then the

7   bump stock thing is really scary too so, you know, --

8           MR. CRUZ:  Well, yeah.

9           THE COURT:  -- I mean I think that's the bottom

10  line.

11          MR. CRUZ:  Yes.  And I think, I think the

12  motorcycle club portion of all of this is window dressing

13  in the sense that it, as the Court states, is not illegal

14  to be a member of a motorcycle club.  The government has

15  failed despite Your Honor's continued questions to link

16  any of the information that's listed in that affidavit to

17  Mr. Sartwell directly and there's only one reason for

18  that.  He has no involvement in any of those incidents or

19  some generic feud that's taking place between motorcycle

20  clubs or that incident involving someone getting shot.

21  There is no evidence linking him to any of that, and I

22  think the stereotypical view of motorcycle clubs is what's

23  driving their argument with regard to dangerousness.  The

24  fact of the matter is someone who is "dangerous" would not

25  have a record, a criminal record that's been inert for

64

1   over a decade and that's what we have here.  The best

2   the government can do is point to cases that are both 10

3   and 20 years old, that were dismissed ultimately, to

4   suggest that he's a danger to the community.  And I

5   understand the Court's concerns about what was discovered

6   at his home, but the reality is the government has also

7   and will have a problem with regard to the silencer that

8   was intercepted and looked at by the ATF or the federal

9   agencies involved in the investigation because the reality

10  is our sense is that that is for an airsoft gun which is

11  not illegal to possess and which if you put on a real gun

12  would literally blow up.  The government itself in one of

13  the exhibits pointed to that wall of airsoft guns, some of

14  which had silencers attached to them, suppressors.

15  They're foam, that's correct, but it's also quite common

16  knowledge that there are silencers that are made to look

17  like real silencers which in fact are not and that's what

18  we're dealing with here, Your Honor.  They could not give

19  the Court details about how they determined that this was

20  a real silencer per the federal statute because it's not.

21  And it's not illegal to possess airsoft guns or to possess

22  parts for airsoft guns, some of which could be bump

23  stocks, Your Honor.  It's all compatible.  In addition to

24  that there are other firearms that are actually blank

25  pistols or starter --

65

1          THE COURT:  So --

2          MR. CRUZ:  -- pistols that are not firearms.

3          THE COURT:  -- bump stocks are compatible with

4    airsoft guns?

5          MR. CRUZ:  Yes, they are, Your Honor.

6          MS. WEINSTEIN:  No, they're not.

7          THE COURT:  Okay.

8          MR. CRUZ:  And they can be used for that

9    purpose.  And again, Your Honor, the dangerousness issue

10   here is so weak in terms of the information that's been

11   provided to the Court that I submit there are conditions

12   that the Court could fashion.  Everything in that garage

13   that would pose a "danger" has been removed at this point

14   and it's not, they left all of the airsoft material there

15   because they don't consider that to be a threat.  It's not

16   illegal.  The Court can certainly impose conditions which

17   require him to turn over other materials that may still be

18   there, but I suspect that everything's been taken

19   including the materials that the agent testified could be

20   used for perfectly legitimate legal purposes; the drill

21   bits, the Dremel tools, et cetera, all of that stuff was

22   removed from the residence and there's no reason to

23   believe that someone with an inert record for 10 years,

24   criminal record, would be a danger to the community if he

25   was sent back to his home under restrictive conditions.

66

1   He just wants to go home.  He wants to continue with his

2   business, working to support his two young children and

3   his wife, and he is not interested in hurting anyone or

4   being a danger to the community as the government

5   suggests.

6           So I think that the Court is well served to give

7   the motorcycle club portion of this argument the weight

8   that it deserves which is that it's meant to intimidate,

9   it's meant to strike fear in people's minds when the

10  reality is Mr. Sartwell is the exact opposite of that and

11  he's not feared in his community, Your Honor.  If he were,

12  again, there would be numerous indications in his criminal

13  record that he's been active and he's not.  So I don't

14  know how this case is different from other firearms cases

15  that come before the Court where conditions are set.

16          In addition to that, Your Honor, I think the

17  government has failed with regard to the statute because

18  the reality is he's charged at this point with being in

19  possession of an unregistered firearm.  And under the

20  definitional section of the bail statute, which is 18

21  United States Code Section 3156(a)(4), there is a

22  definition of crime of violence from the (f)(1)(E) portion

23  of the bail statute that states that the offense has to

24  have an element of the use, attempted use or threatened

25  use of physical force against another person.  And

67

1 possession of an unregistered firearm would not be

2 considered a crime of violence under that definition.  If

3 we're talking about a crime of violence that involves the

4 use of a weapon, a firearm, we don't have that here and

5 that's what (f)(1)(E) states.  So I would suggest to the

6 Court that the government hasn't met its burden with

7 regard to that particular portion of the bail statute.

8          THE COURT:  So that's the presumption portion?

9          MR. CRUZ:  Yes, Your Honor, (f)(1)(E).  This

10 isn't a crime of violence, Your Honor, and that's what's

11 cited to in that particular section of the bail statute.

12          THE COURT:  Okay.

13          MR. CRUZ:  He's not even charged as a felon in

14 possession of a firearm.  So I would suggest to the Court

15 that's another issue that is to be considered with regard

16 to detention at this particular point if what we're

17 dealing with is the (f)(1)(E) portion, danger presented

18 because of the nature of the offense that we're dealing

19 with which doesn't involve use of force or threat of use

20 of force at all.  So, Your Honor, I think that there is a

21 record before the Court that would allow it to fashion

22 conditions that would assure that he will appear as

23 directed to court dates and that there won't be any danger

24 posed to the community.  Again, all of those materials

25 were removed from the home and the material that he did

68

1   receive which gave the government information to obtain

2   a search warrant, I would suggest to the Court down the

3   line it's going to be shown that there was not a firearm

4   and that's how they get in.

5          THE COURT:  Okay.  Okay, so anything else?  Yes?

6          MS. WEINSTEIN:  Just two follow ups.  I would

7   argue, number one, Government's Exhibit 9 does indicate

8   that it was a firearm.  I provided the Court with the

9   reports of the ATF agent who examined the silencers that

10  were found, the parts and the ghost gun, who deemed all of

11  those to be weapons, firearms pursuant to federal law.

12  Defendant argued that a bump stock is compatible with a,

13  with airsoft.  I believe there's nothing proffered other

14  than defense counsel's own opinion of that.  the Court has

15  heard from Special Agent Nagle who indicated to the

16  contrary as is also evident that found in that home was

17  the guide that list bump stock as one of the items that

18  you needed to use to assemble an AR-15.

19         THE COURT:  Is it butt or bump that you're

20  talking about?

21         MS. WEINSTEIN:  Both.  So my understanding is

22  bump stock has a bit more of the bells and whistles.  The

23  generic name is Buttstock.

24         THE COURT:  I see.

25         MS. WEINSTEIN:  And defense claims that directly

69

1   contrary as the Court can read from 3142(f)(2)(E),

2   f(1)(E), any non-violent felony, otherwise, that involves

3   the possession or use of a firearm or destructive device

4   or any other dangerous weapons so I, in terms of defense

5   characterization that this doesn't fit under (f)(1)(E),

6   the plain language of it states directly to the contrary.

7         THE COURT:  Okay.  So I'm going to -- I'll hear,

8   yes, go ahead.

9         MR. CRUZ:  Your Honor, I just wanted to make

10   sure that the Court had received the letters of support

11   for Mr. Sartwell.

12         THE COURT:  I certainly did and --

13         MR. CRUZ:  Yes.

14         THE COURT:  -- I think there must be some of the

15   authors of the letters here and thank you very much for

16   doing that, and I mean I hope the government also got

17   those.  If you read the 27 pages of letters in support of

18   Mr. Sartwell it certainly paints a different, completely

19   different picture of him than as a motorcycle criminal

20   stockpiling weapons.  So I just have to say I'm going to

21   take this under advisement because I have not even seen

22   the government's reports that were entered into evidence

23   before so I need to look at those and I'm going to give

24   the parties some time in case they want to file something

25   else.  If the government, I'm really -- I don't know how

70

1   to take into consideration the information in the

2   complaint without some further support or elaboration that

3   Mr. Sartwell has anything to do with a feud.  It's just

4   too attenuated.  If he does then I do think the evidence

5   has a kind of different cast to it here.  If all you have

6   is that there is a feud going on between motorcycle clubs,

7   I don't know that that's really compelling to me right

8   now.  So I'm going to give the parties, today is

9   Wednesday, I'll give the parties until Monday, well that's

10  the holiday.  I'll give the parties until Tuesday November

11  12th to file anything further, and I do think the

12  presumption is relevant here, so if you have a technical

13  argument on whether the presumption applies, I'm happy to

14  hear from you and so is that okay till the end of the day

15  on Tuesday for the government?

16          MS. WEINSTEIN:  That's fine, Your Honor.

17          THE COURT:  Okay.  And then I'm going to review

18  this information and I did read the letters already but,

19  and then I'll figure it out.

20          MR. CRUZ:  Yes, Your Honor.  And, Your Honor, if

21  the Court -- we would ask that the Court direct that

22  pretrial services office to make a home visit in case the

23  Court has concerns about whether it would be an

24  appropriate place for him to be released to.  They could

25  visit, speak with his wife who is here and can accommodate

1  them, and we'd be in a position to report to the Court

2  or probation could about what the, the appropriateness of

3  going back home would be because that was one of the

4  government's arguments that he shouldn't be released

5  there, and at least they'll be able to see, you know, what

6  the situation is there and that he doesn't have access to

7  these materials that --

8          THE COURT:  So I will just say for probation to

9  ever be going into a home that, just so bristling with

10 weapons, whether they're airsoft or whatever, is really

11 not acceptable, but I'll talk to probation about that and

12 if they do contact the family I'm sure they'll be

13 cooperative.

14         MR. CRUZ:  Yes, Your Honor.  And I think they've

15 been removed.  They can confirm with the government all of

16 those things.

17         THE COURT:  Okay.  All right.  So I'll just take

18 this under advisement.  Thank you very much.

19         MS. WEINSTEIN:  Thank you, Your Honor.

20         THE CLERK:  Court's in recess.

21 (Court adjourned.)

22 (12:29:21 p.m.)

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

72

1                          CERTIFICATION

2        I, Maryann V. Young, court approved transcriber,

3    certify that the foregoing is a correct transcript from

4    the official digital sound recording of the proceedings in

5    the above-entitled matter.

6

7    /s/ Maryann V. Young                December 31, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25