UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.   19-CR-10479-DJC |
| | ) | |
| BRUCE SARTWELL | ) | |

### DEFENDANT'S EMERGENCY MOTION TO RECONSIDER PRETRIAL RELEASE ON CONDITIONS BASED ON CHANGED CIRCUMSTANCES AND THE COVID-19 PANDEMIC

The Defendant, Bruce Sartwell, respectfully moves this court, on an emergency basis, to reconsider its prior order regarding pre-trial detention and to release him on conditions pending trial in this matter. The Government objects.

Mr. Sartwell is charged with a non-violent offense, possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d).1  Detention hearings have been held in this matter before both the Magistrate and District Court Judges assigned to this case on November 6, 2019 and then again on January 31, 2020.  *See* Docket Entry ("DE") 6, 24.  On both occasions, the Court issued orders of detention for Mr. Sartwell, not based on his being a risk of flight but rather on the conclusion that he posed a potential danger to the community based primarily upon the circumstances surrounding the discovery of the firearm at issue.  *See* DE 11, 25.

In both instances, the Court placed a particular emphasis on discomfort with the prospect of Mr. Sartwell potentially releasing to his home address.  The reasoning was consistent in both

---

1 The Government has not charged Mr. Sartwell with any additional counts in a superseding indictment relative to any other items found at his residence.  This includes the purported "silencer" that was intercepted by law enforcement at a U.S. Postal Service location prior to delivery to Mr. Sartwell's residence.  This alleged silencer figured prominently in the application for a search warrant for Mr. Sartwell's residence and ultimately led to the discovery of the unregistered AR-15 style rifle with which he is currently charged.

orders and highlighted that the Sartwell home is where law enforcement discovered an AR-15 style rifle that had been secreted in a hidden area in the garage.  Moreover, other firearm accessories (including a purported silencer and a body armor plate), ammunition, and tools that could be utilized to build similar rifles were discovered in various areas of the home.  In preparation for his initial detention hearing, Mr. Sartwell did participate in a Pretrial Services interview. He is currently being detained at the Plymouth County Correctional Facility ("Plymouth").

In terms of preexisting medical problems, Mr. Sartwell describes that he uses an inhaler (albuterol) in order to address problems with his breathing.  Albuterol is used to treat individuals who suffer from asthma as it is referred to as a bronchodilator and relaxes the muscles of the human airway and increases airflow to the lungs.  Given the existence of a history of respiratory problems, the current conditions at Plymouth place Mr. Sartwell at high risk both for contracting COVID-19 and for potentially experiencing life-threatening complications.  He is terrified that his health will most certainly deteriorate the longer he remains in his current situation.

The Plymouth facility has done little to create a safe environment for inmates and staff that implements adequate social distancing measures.  Mr. Sartwell has reported the following to defense counsel about the conditions in the jail.  The unit or "Pod" that Mr. Sartwell is housed in has been split in half.  The inmates are locked in for 20 hours a day and each half of the "Pod" is allowed out of their cells at different times.  This was the case even during the Easter holiday.  When inmates are outside of their cells to eat or watch television in the common area, they still sit side by side but are not able to be 6 feet apart from each other.  The bathroom and shower facilities offer no more privacy.

Each inmate is provided a single facemask once a week.  As described in recent media reports, re-use of masks for days at a time is not optimal unless they can be cleaned somehow.  That is not an option that is available at Plymouth.   In addition, inmates are provided with no cleaning products for use in their cells.   Even more alarming, the jail staff and nurses in medical are not wearing facemasks regularly and Mr. Sartwell, as well as other inmates in his unit, feel that this is how the virus is going to get into the facility as they are the only individuals leaving and reentering the jail.

Mr. Sartwell has observed that when any inmate appears to be ill, the guards simply take the individual to a different unit at the jail to quarantine them.   No follow up testing of inmates in his "Pod" is being done as the jail does not have the volume of testing kits necessary to undertake such a task.   In terms of the cleanliness of the "Pod"/unit, Mr. Sartwell is allowed out of his cell on occasion to help wipe down hand railings and surfaces in the common area with a single cleaning rag.   The guards spray a small amount of cleaning solution on the rag before it is given to him to use.   It is just a matter of time before the virus is confirmed to be present at Plymouth and at that point, it will likely be too late for the inmate population housed there.   The Donald Wyatt Detention facility ("Wyatt") in Rhode Island had similarly reported no cases of COVID-19 among the inmate population at their facility.   The first confirmed case of an inmate testing positive was reported on April 21, 2020.   As of today's date, April 24, 2020, the United States Marshals Service has reported to the U.S. District Court for the District of Massachusetts that the number of inmates testing positive for the virus is now 8 with a little over 20 additional testing results for other inmates still outstanding.

**Background**

As of April 24, 2020, the new strain of coronavirus, which causes COVID-19, has infected over 2,736,979 people, leading to at least 192,125 deaths worldwide.[2] On March 11, 2020 the World Health Organization officially classified COVID-19 as a pandemic.[3] On March 13, 2020, President Trump declared a national emergency to address the pandemic.[4] Governor Baker declared a state of emergency in Massachusetts on March 10. To date, the pandemic has caused the Governor to issue well over 30 emergency orders.[5] Those orders range from closing all elementary and secondary schools to prohibiting on-site consumption of food and beverages to restricting visitor access to nursing homes to prohibiting public gatherings of more than 25 people. Id. Governor Raimondo of Rhode Island declared a state of emergency on March 9th and has issued similar orders.[6] As an example, on March 27, 2020, the state of Rhode Island will

---

[2] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard (April 24, 2020), at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

*See also* World Health Organization, Cornoavirus disease 2019 (COVID-19) Situation Report – 62 (Mar. 21, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200322-sitrep-62-covid-19.pdf?sfvrsn=f7764c46_2

[3] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020) at https://bit.ly/2W8dwpS.

[4] Remarks by President Trump, Vice president Pence, and Members of the Coronavirus Task Force in Press Conference (March 13, 2020). https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-conference-3/

[5] https://www.mass.gov/info-details/covid-19-state-of-emergency.

[6] Governor Raimondo's executive orders are available at https://health.ri.gov/diseases/ncov2019/. See also Eli Sherman, 83 Total COVID-19 cases in RI; Gov Orders Additional Business Closures, WPRI.com (Mar. 22, 2020)

stop any motor vehicles with New York license plates to question their compliance with quarantine protocols. The states of California, Connecticut, Illinois, New York and New Jersey have issued "stay at home" or "shelter in place" emergency orders prohibiting non-essential travel and assembly. At the time of the drafting of this motion approximately 84 million Americans are subject to "stay at home" or "shelter in place" orders.

Following the lead of government officials, this Court has issued multiple General Orders relative to coronavirus, including continuing all jury trials that were scheduled to begin before April 27th (General Order 20-2) and continuing all criminal hearings and deadlines other than motions for release or detention for 60 days, unless there is a case-specific liberty or public safety interest. (General Order 20-4). Other measures include postponing grand juries, civil mediation sessions and naturalization ceremonies, and restricting courthouse visitors.

Virtually all of the precautionary measures are designed to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is highly contagious. The Centers for Disease Control and Prevention ("CDC") advise that the virus passes through coughing and by contact with surfaces.[7] New data published in the New England Journal of Medicine found that the highly-contagious "virus can remain viable and infectious in aerosols for hours and on surfaces up to days."[8] To combat transmission, the CDC has issued

---

https://www.wpri.com/health/coronavirus/raimondo-covid-19-update-sunday/.

[7] *See* "How It Spreads," Center for Disease Control and Prevention (last accessed 03/21/2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[8] Neeltje van Doremalen, et. al, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med., (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973.

guidance discouraging gatherings of more than 10 people in one place.[9] The CDC also urges social distancing—every person should remain at a distance of at least six feet from every other person.[10] Proper hygiene, including frequent cleaning of all surfaces and frequent, thorough hand washing is also recommended.

### A. COVID-19 Presents an Even Worse Threat In High-Risk Settings Like Jails.

The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. In prison people are confined in close proximity to one another and to the staff. When people must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater. In addition, there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill-equipped.

Compounding the problem, many people who are incarcerated also have chronic underlying health conditions, like asthma, diabetes, hypertension or HIV, that place them at elevated risk for contracting serious COVID-19. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial

---

[9] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[10] *See* supra note 7; see also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

detention centers.[11]  Recently gathered statistics also indicate that minority populations in this country, particularly African-Americans and Hispanics, are being disproportionately affected by this pandemic.  https://www.nbcnews.com/meet-the-press/video/african-americans-seeing-higher-rates-of-hospitalization-and-fatalities-81947717694.  This is attributable to socioeconomic pressures that result in a historical lack of access to health care in these communities, poor nutrition options, and medical problems that many individuals are not even aware they have.  It is no secret that this country's prison population is weighted toward African American and Hispanic individuals and Plymouth is no exception.

Plymouth is a congregate jail facility that that was designed to hold up to 1,200 prisoners.[12] Plymouth is no different than a cruise ship[13] or nursing home[14] – places where the virus has run rampant. The facility is an environment in which the COVID-19 virus can easily gain a foothold and, when it does, spread rapidly jeopardizing the life and safety of the Defendant.  This is evident from the outbreak that has occurred at Wyatt.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves

---

[11] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

12  https://pcsdma.org/abouthistory.html

[13] Center for Disease Control & Prevention, COVID-19 and Cruise Ship Travel (last accessed March 21, 2020) https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship.

[14] Los Angeles Times, Seattle-area nursing home deaths jump to 13 with COVID-19 and 11 of unknown causes, https://www.latimes.com/world-nation/story/2020-03-07/nursing-home-coronavirus-deaths.

safe;" "infection control is challenging in these settings."[15] Medical professionals behind bars are sounding the alarm as well. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . .Please let as many out as you possibly can."). *See also* Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Cornoavirus*, The New Yorker, Mar. 20, 2020.

In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[16] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[17] In the U.S., steps are already being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the refusing the admission of individuals arrested on non-violent misdemeanor charges. *See, e.g.,* Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, Wall Street Journal (Mar. 22, 2020). This is happening in Massachusetts as well. *See Citing Risk of Coronavirus Spread, DA Rollins Seeks Release of Many Suspects From Custody*," WCVB Channel 5 (Mar. 20, 2020) available at

---

[15] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[16] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) at https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[17] *Coronavirus: Iran Temporarily frees 54,000 prisoners to combat spread,* BBC News, (Mar. 3, 2020) https://www.bbc.com/news/world-middle-east-51723398.

https://www.wcvb.com/article/citing-risk-of-coronavirus-spread-da-rollins-seeks-release-of-many-suspects-from-custody/31781799#

Realizing that a crisis is looming, voices in Congress are calling on the Department of Justice to "do all they can to release as many people as possible who are currently behind bars and at risk of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P Barr ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action.");[18] *see also* March 19, 2020 Letter from Senator Kathleen Harris to BOP Director Michael Carvajal (noting that "[e]merging research has demonstrated how dangerous coronavirus is for the elderly and those with underlying conditions and compromised immune systems" and urging BOP to "tak[e] reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus").[19]

---

[18] Available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf

[19] Available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf

*See also* March 9, 2020 letter from fifteen United States Senators to BOP Director Carvajal, available at https://www.warren.senate.gov/imo/media/doc/2020-03-09%20Senator%20Warren%20Letter%20to%20BOP%20re%20Coronavirus.pdf

*See also* Mark Hallum, *Three New York Congress members tell feds to spring non-violent offenders from jail*, AMNY (Mar. 22, 2020) available at

Federal Courts are also beginning to recognize the risk and follow suit. *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis"); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health

---

https://www.amny.com/coronavirus/three-new-york-congress-members-tell-feds-to-spring-non-violent-offenders-from-jail/

Emergency" caused by COVID-19); *see also United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

Mr. Sartwell uses an albuterol inhaler to address his preexisting respiratory issues. The conditions he describes at Plymouth will not protect him from the heightened risk he faces if he contracts the virus. He and his family are living in constant fear of the environment in which he is being forced to live and they feel he is in jeopardy every minute of the day.

**LEGAL ARGUMENT**

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). *See also United States v. Angiulo*, 755 F.2d 969, 972-73 (1st Cir. 1985) (holding that the magistrate who issues a detention order has inherent authority to reconsider that order). Compelling reasons may exist where release is necessary for the preparation of the defendant's defense, see 18 U.S.C. § 3142(i), or where the defendant's

11

serious medical conditions warrant release, *see, e.g., United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (explaining that a defendant who is denied bail "retains the ability to request[,] . . . in extraordinary circumstances, . . . temporary release under § 3142(i)" should future developments with respect to his medical conditions so warrant); *see also United States v. Birbragher*, No. 07-cr-1023-(LRR), 2008 WL 1883504, at *2 (N.D. Iowa Apr. 25, 2008) (describing *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993), and *United States v. Cordero Caraball*o, 185 F. Supp. 2d 143 (D.P.R. 2002), as cases in which courts found "compelling reason" to temporarily release defendants due to the defendants' serious medical issues)

The circumstances that existed when Mr. Sartwell's prior detention hearings concluded have now drastically changed. There is a pandemic that poses a direct risk to Mr. Sartwell that is far greater if he continues to be detained during this public health crisis. Mr. Sartwell is particularly vulnerable to coronavirus due to his respiratory issues and because he is being forced to live in close proximity to individuals who are not being tested in an environment where the disease will likely spread quickly.   This situation is intolerable and inhumane and continued incarceration seriously jeopardizes his health and life.

    **A. The Bail Reform Act Requires Mr. Sartwell's release.**

As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before

trial). One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales-Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), cert. dismissed sub nom., *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Sartwell will yield, relative to the heightened health risks posed to Mr. Sartwell during this rapidly encroaching pandemic. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention). Courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. *See United States v. Scarpa*, 815

F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"); *United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

### B. There are Conditions of Release that Reasonably Assure Mr. Sartwell is not a danger to the community.

The Bail Reform Act requires the Court to impose "the least restrictive [] condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The defense submits that there are conditions of release that can be crafted in this case, specifically home detention with electronic monitoring at an alternative address, that will mitigate any presumed danger Mr. Sartwell may pose, while allowing him to remain isolated in a home-setting. Mr. Sartwell can reside with a family friend, Matthew Robert Nelson, at his address in Hanover, MA.  That address and other contact information will be provided to the United States Probation Department. Mr. Sartwell poses no danger to the community while on home-detention with electronic monitoring at an address that is not linked to firearms, firearms accessories, or tools to potentially build firearms.  Everything the Magistrate and District Court judges were concerned about related to a release to the Sartwell

14

home is addressed by allowing for him to live at an alternative address that would be investigated by the U.S. Probation Department. To that end, the defense respectfully requests that this Court grant conditions of release or, in the alternative, re-open the bond hearing and allow the defense to present arguments in favor of bail to the Court.

## CONCLUSION

Wherefore the Defendant moves this Court to grant the following relief:

A. Hold an emergency hearing on this motion as soon as possible; and

B. Allow the Defendant to appear by video; and

C. Grant this motion and release the Defendant on conditions set forth above as well as any additional conditions that the Court deems necessary; and,

D. Grant such further relief as is just.

Respectfully Submitted

BRUCE SARTWELL
By His attorneys,

*/s/Oscar Cruz, Jr.*
Oscar Cruz, Jr.,
BBO #630813
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA   02210
(617) 223-8061

*/s/Jessica Thrall*
Jessica Thrall
Assistant Federal Public Defender

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 24, 2020.

*/s/Oscar Cruz, Jr.*
Oscar Cruz, Jr.