UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 19-cr-10479-DJC |
| ) | |
| BRUCE SARTWELL, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER PRETRIAL RELEASE IN LIGHT OF COVID-19 PANDEMIC**

The government opposes Defendant Bruce Sartwell's (hereinafter, "Defendant" or "Sartwell") motion seeking release from custody due to the COVID-19 pandemic. *See* Docket Entry ("D.E.") 31 (hereinafter the "Motion"). The evidence presented to both the Magistrate Judge and then again to the District Judge demonstrated by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community[1] if the defendant were to be released.

Neither the current COVID-19 pandemic nor the defendant's newly self-reported health issues provide a sufficient basis to release this defendant. Sartwell raises systemic concerns that apply to all detained individuals at the Plymouth County Correctional Facility (hereinafter "Plymouth" or "PCCF"). While the Motion mentions Sartwell's use of an inhaler, it fails to identify an individualized diagnosis (i.e. asthma) or other facts regarding his health condition that puts him at a greater risk if he contracts COVID-19 than the average inmate at Plymouth. Further, Sartwell raises no more than the speculative prospect of an uncontrolled[2] COVID-19 outbreak at Plymouth, and fails to demonstrate the inadequacy of either the measures taken by administrators and staff to prevent the spread of the

---

[1] The government maintains that the defendant poses a risk of flight as well.

[2] The government recognizes that at the time of the filing of this Motion and as of the April 29, 2020, there were four confirmed cases of COVID-19 at PCCF, three staff and one inmate, described *infra* and in Exhibit A – Affidavit of Sheriff of Plymouth County, Joseph D. McDonald Jr. The government discusses below the precautions taken by PCCF in response to the newly confirmed cases further below.

virus, or the medical care that he would receive at Plymouth if he were to fall ill.  For the reasons set forth in greater detail herein, this Court should DENY Sartwell's Motion.

## BACKGROUND

The one count indictment charges Sartwell with possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d) related to the recovery of an AR-15 style rifle ("ghost gun") hidden in a panel in his "Monster Bar" [3] in his garage recovered during the execution of a search warrant at his home on October 30, 2019.  Sartwell was arrested on October 30, 2019 after the discovery of the AR-15 and appeared before the Court for his initial appearance that same day at which time the Government moved for detention. Pretrial services recommended that the defendant should be detained because he posed a risk of flight and of import, that he posed a danger to the community. On November 6, 2019, this Court held a detention hearing. D.E. 6. On November 26, 2019, the Court found that no condition or combination of conditions would reasonably assure the safety of any other person and the community pursuant to 18 U.S.C. § 3142(e), ordered Sartwell detained, and stated the following as grounds for the detention order:

> The Court's decision to detain is based on the particular circumstances of this case, where Mr. Sartwell is possession of an unregistered firearm. He came to the government's attention because a suspicious package was delivered to his home, which he admitted he had ordered from China. It turned out to be a silencer. This is one of 65 packages addressed to him from Asia since 2018, at least some of which appear to be suspicious and connected to firearms. He is a felon and may not possess firearms. When police searched his home, they found body armor; a completed, working AR-15 rifle that was hidden in a compartment in Mr. Sartwell's garage, which is a "ghost" gun, that is, homemade two rifle magazines capable of holding 30 rounds of ammunition; partial parts for another AR-15; 153 rounds of high velocity ammunition; milling plates and other tools that could be used to manufacture "ghost" guns; a "how to" guide for building an AR-15; and another silencer. There is evidence that recently someone searched on Mr. Sartwell's computer for "bump stocks" and articles related to the Las Vegas shooting and how to make a gun fire like a machine gun.
>
> If Mr. Sartwell had simply illegally possessed a firearm, the court might find that release was appropriate. But here, the firearm, which was an AR-15, a gun that had been used in mass shootings, was stored in a hidden compartment in a bar that Mr. Sartwell had built, and he also had large capacity magazines, 153 rounds of high velocity ammunition, two silencers

---

[3] The defendant's self-proclaimed moniker is "Monster."

and body armor. These facts are very concerning and suggest that Mr. Sartwell, who is not permitted to possess firearms, was preparing for some violent act: otherwise, what was he doing with these items?

D.E. 11.[4]

Sartwell appealed this Court's detention order on November 26, 2019 and the United States District Judge Denise J. Casper held a hearing on January 31, 2020. D.E. 24. On February 14, 2020, Judge Casper denied the appeal the detention order and stated the following:

> [P]ossession of the AR-15 style rifle, the "ghost gun,"…in and of itself is a serious charge (supported by the substantial weight of evidence in the present record, and if resulted in conviction, could lead to several years of imprisonment), but the facts and circumstances in which firearm was discovered are also concerning as a public safety matter.  Unlike the (non-firearm) Airsoft rifles affixed to the wall of the garage…the unregistered firearm, tools and manuals to assemble same, and the ammunition that could be used with it were concealed in hidden compartments throughout Sartwell's residence…even firearm and silencer parts, tools to assemble a AR-15 and an instruction manual for same [were hidden]…although the defense would have this Court disregard any weight the government put on Sartwell's position as President of the East Bridgewater/Brockton chapter of the Outlaws Motorcycle Club,… such disregard here does not change the discovery of the concealed, unregistered firearm found in his residence, along with evidence of the tools to build ghost guns, use them (i.e., ammunition, silencers) or allow for more rapid firing of same (i.e., evidence that someone using user ID of "monst" (with which a photograph of Sartwell was associated) had recently searched sites for building "bump stocks," a device that can allow for quicker, more rapid firing….The Court has considered the conditions that Sartwell has proposed for his release…but even in combination, these conditions would not assure the safety of others and the community against the backdrop of the other factors.

D.E. 25.

## ARGUMENT

A defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).  A court may reconsider its decision regarding pretrial detention "if the judicial officer finds that information exists that was not

---

[4] The Court's reasons for detention included the following: 1) weight of evidence against defendant strong; 2) prior criminal history; and 3) history of violence or use of weapons, in addition to citing the circumstances of the case showed the government met its burden of proof by clear and convincing evidence that no conditions will reasonably assure the safety of any person or the community.

known to the movant at the time of the [detention] hearing and that has a material bearing on the issue" of detention. 18 U.S.C. § 3142(f)(2). Further, the "judicial officer may, by subsequent order, permit the temporary release of the person . . . to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reasons." 18 U.S.C. § 3142(i). The defendant carries the burden of showing that his release is necessary to the preparation of his defense or for another compelling reason. *See United States v. Dupree*, 833 F.Supp 2d 241, 246 (E.D.N.Y. 2011). In this case, this Court and Judge Casper previously found, by clear and convincing evidence, that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community. The factors in 18 U.S.C. § 3142(g) weighing heavily in favor of detention include: the nature and circumstances of the charged offense (that is, possession of a homemade assault rifle and the tools, magazines and ammunition needed to use and create them), the strength of the evidence, the potential penalty the defendant faces if convicted, his criminal history, and of import, the nature and seriousness of the danger posed by release. These factors have not changed.

The COVID-19 pandemic—while undoubtedly serious and necessitating strong precautionary steps, particularly in detention facilities—does not negate or overcome the risks that this defendant poses to the community nor does it warrant reconsideration of the Court's detention order. Indeed, while the articles referenced in his motion encourage courts to release prisoners, they do not encourage release of individuals in Mr. Sartwell's circumstances. *See* D.E. 31, fn. 19, Hallum Article ("Elected officials…are telling federal agencies to…release *non-violent offenders and elderly* convicts *who pose no risk to the public* to protect their health from the spread of coronavirus.") (emphasis added). Far from a low-level non-violent offender, Sartwell poses a genuine danger to public safety given his access to weapons (both legal and illegal) and ability to procure parts for and build his own assault rifles no matter where he intends to reside during release.

To be sure, the COVID-19 pandemic presents a public health emergency. All facets of national, state, and local government have turned their focus and determination to slowing the spread of the outbreak, protecting the health and safety of the community, and tending to the medical needs of those who have contracted the virus. That focus and attention includes the authorities and staff responsible for our federal and state detention facilities, including at Plymouth, the facility at which the defendant is currently housed. It also includes our courts and all those involved in the criminal justice system, who are adjusting our standard procedures and practices to minimize the risk of transmission. The government is committed to ensuring the safety and health of defendants like Sartwell. While the risk of COVID-19 is real and significant, Sartwell fails to demonstrate that the COVID-19 pandemic warrants his release, as he does not provide a meaningful nexus between the virus and himself.

Sartwell, age 48, claims that "he uses an inhaler (albuterol) in order to address problems with his breathing," yet objective medical evidence to support his claims of "a history of respiratory problems" is scant. D.E. 31. Of note, the defendant did not mention an inhaler nor "preexisting respiratory issues" to pretrial services during his pre-detention hearing interview. The government asked defense about any medical documentation or prescriptions related to the defendant's need for an inhaler and learned there was none. If indeed the defendant had *mild* asthma (which he has not gone so far to claim he has), this would not necessarily put him at greater risk of complications than the average individual if he contracted COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (stating that "people with *moderate to severe asthma* may be at higher risk of getting very sick from COVID-19) (emphasis added) (last visited May 3, 2020). Even if Sartwell does need an inhaler for asthma-like issues, this would not make him uniquely more vulnerable than others given that one in thirteen people have asthma as noted by the Asthma and

Allergy Foundation of America.[5] *See United States v. Pridgen*, 19-10375-RGS, Doc. 73 (D. Mass. April 29, 2020) (reversing Magistrate Judge's decision to release defendant, in part, because defendant's ***documented*** medical circumstances –hypertension, – which 33.2% of American adults suffer from – "are not so exceptional as to tilt the balance in favor of temporary release."). Regardless, even were solid documentation provided, the serious danger he poses to the community outweighs any risk of COVID-19 infection.

In actuality, Sartwell makes broad arguments about the general danger of prison settings during a pandemic. In preparing to respond to motions such as the instant one, this office – and the undersigned Assistant – has consulted with officials at Plymouth to obtain relevant information as to its handling of the public health crisis. Plymouth, by following Massachusetts' Department of Public Health guidance, has acted swiftly and responsibly to implement precautionary measures to help prevent the introduction and transmission of COVID-19 in its facility and to otherwise maintain a safe environment for its detainees.[6] Plymouth has taken special precautions to protect inmates and staff from exposure to the Coronavirus. *See* Affidavit of Sheriff Joseph D. McDonald, Jr. (dated April 28, 2020), attached hereto as Exhibit A (hereinafter, "McDonald Affidavit")[7] and Affidavit of Lawrence Baker, M.D., Medical Director for Plymouth (dated April 15, 2020), attached hereto as Exhibit B (hereinafter:

---

[5] *See* Asthma and Allergy Foundation of America's website https://www.aafa.org/asthma-facts/ (citing statistics from the CDC's website) (last visited May 3, 2020).

[6] These announcements have been posted to the Plymouth County Sheriff's Department website, https://www.pcsdma.org/covid.html (last accessed May 3, 2020).

[7] This Affidavit was completed on April 28, 2020 and filed in *Maza-Charco v. Moniz*, Civil No. 20-10769-ADB. Given the nature of that litigation, a portion of that declaration specific to a "petitioner," that is, paragraph 11, is not applicable to Sartwell's case and is redacted here. Said paragraph references the petitioner by name and housing unit. The petitioner's housing unit is different than Sartwell's. While this paragraph is not relevant to this case, the portions of the declaration setting forth precautions taken facility-wide are.

"Baker Affidavit").[8] Plymouth maintains a full-time medical staff, including a medical doctor who is on-site 40 hours per week, a nurse practitioner or physician's assistant who is on-site 36 hours per week, and on-call coverage 24 hours a day. *Id.* ¶ 3.  Since the onset of the COVID-19 outbreak, the precautions Plymouth has taken to protect the exposure of inmates and staff to the coronavirus include, but are not limited to, adopting treatment and detection practices consistent with CDC and DPH guidelines; suspending visits by friends, families, and volunteers, and replacing them with two free telephone calls per week; restricting attorney visits to non-contact and disabling monitoring and recording functions for visit phones; keeping non-essential staff from entering Plymouth; ceasing inmate work assignments outside Plymouth; eliminating unnecessary movement within Plymouth; establishing a housing unit for newly admitted inmates and inmates who have left and returned to Plymouth in which such inmates remain until they have cleared the incubation period; working with the courts to limit travel outside Plymouth by having hearings conducted by videoconference and telephone; changing recreation and meal schedules to reduce the number of inmates in the recreation and meal spaces at the same time; maintaining an aggressive cleaning regimen for the housing units; educating staff and inmates with respect to sanitation and proper social distancing; providing inmates with soap at least once a week; providing inmates with cleaning supplies; conducting temperature screening for all employees, contractors, and visitors to Plymouth; and providing surgical masks for all inmates and staff. *Id.* ¶ 6.

Although the McDonald Affidavit indicates that as of 2:44 p.m. on April 28, tests on two inmates were pending, the undersigned understands that those tests are negative. Three staff members have tested positive, as described in McDonald's Affidavit: the first on March 19, 2020, of a staff

---

[8] This Affidavit was submitted in connection with *Baez, et al v. Moniz*, Civil No. 20-10753-LTS. Like the McDonald Affidavit, the portions of the affidavit setting forth the precautions taken facility-wide, particularly screening and testing of inmates and steps to ensure that staff do not introduce COVID-19 into the facility, are relevant in Sartwell's case.

member who did not have close contact with any inmates or detainees; a second positive test on April 28, 2020 of a staff member who does not work inside the facility; and a third, also on April 28, 2020, who according to surveillance footage, did not have any close contact with any inmates or detainees. *Id.* ¶¶ 8-10. Since the drafting of the McDonald Affidavit, one inmate tested positive on April 30, 2020. According to conversations with Patrick C. Lee, General Counsel for Plymouth County Sheriff's Department, undersigned counsel learned that this is the first positive test of anyone in the inmate and detainee population at Plymouth. This inmate arrived at Plymouth on April 24, 2020 after an arrest on county charges, and is housed at Plymouth as a state pretrial detainee. During intake, the inmate denied contact with anyone with COVID-19. Per protocols, the inmate was quarantined upon his arrival, first in the booking unit in his own cell (from April 24 until April 28), and then in the intake quarantine unit (from April 28 until April 29). On April 29, the inmate presented with symptoms and was tested for COVID-19. Moments later, the inmate reported to the medical provider administering the test that he had had close contact with two individuals on April 21, April 22, April 23, and the morning of April 24 before his arrest. He further reported that he recently learned that those individuals had tested positive for COVID-19. That day, while the results were pending, the inmate was placed in isolation in the medical unit as a precaution. The next day the test came back positive. The inmate remains in isolation in the medical unit, where he is assigned to a negative pressure room. There is 24/7 nursing care on site; checks of vital signs twice daily; and a transportation plan in the event of severe symptoms. As a result of the positive test, all inmates who were in intake quarantine in the same "group" as this inmate now will remain in intake quarantine on watch for an additional fourteen days. It is clear from *supra* and attached affidavits of McDonald and Baker that Plymouth has acted swiftly and responsibly to implement precautionary measures to help prevent the introduction and transmission of COVID-19 in its facilities and to otherwise maintain a safe environment for its detainees.

Further, Sartwell's claims of inadequate conditions in his housing unit are without merit. As of April 27, 2020, there were 674 inmates and detainees at Plymouth, well under the maximum capacity

of 1,742 inmates. McDonald Affidavit ¶ 7. Undersigned has been advised by Patrick C. Lee, General Counsel for Plymouth County Sheriff's Department, that as of May 1, 2020, Sartwell was in a unit with a capacity for 139 inmates, but which houses currently only 67, and since January 30, 2020, the defendant has been in his own cell. The unit is, indeed, divided into two groups for recreational and meal times. Therefore, only one quarter of the normal maximum capacity of inmates in this unit are out of their cells at any given time, thus, any concerns regarding inmates sitting "side by side" when they are out of their cells is not because of a lack of space in the unit. Further, while Sartwell complains of a lack of cleaning products in individual cells, these items are, for obvious reasons, left at the officer station in each unit and inmates are routinely encouraged to clean during recreational time. Plymouth's policy of providing masks weekly to asymptomatic inmates in fact *exceeds* the guidance as set forth by the CDC related to mask wearing in facilities.[9] *See* https://www.cdc.gov/coronavirus/2019-ncov/downloads/managing-COVID19-in-correctional-detention.pdf at 24 (hereinafter: CDC Correctional Facility Guidance) (recommended PPE guidance only includes that a face mask be used for individuals with confirmed or suspected COVID-19 and that PPE recommendations for asymptomatic incarcerated persons is to "apply face masks for source control as feasible based on local supply, especially if housed as a cohort.") (last accessed May 4, 2020).

Furthermore, the defendant has not shown that his proposed plan for release would actually mitigate his risks of COVID-19 or his danger to the community. The defendant proposes living with his friend, Mr. Nelson, in Hanover, MA. He offers no evidence that this proposed plan would actually

---

[9] The defendant makes a bold vague assertion that jail staff and nurses in medical "are not wearing masks regularly," but does not provide a concrete example of this. According to CDC guidance masks do not need to be worn "regularly" or "all the time," but instead when an individual is within six feet from someone else Without knowing details about what this vague bold assertion is based upon, the government can only assume that the defendant is not taking into account the CDC guidance that masks do not need to be worn regularly or even all the time, but instead when a staff has "direct contact" (i.e. is within six feet) of an inmate to the extent "local supply and scope of duties allow.") *See* CDC Correctional Facility Guidance at 24.

mitigate the risk of infection compared to the risk he faces while detained at Plymouth. Indeed, the Defendant offers no details about the comparative risk he faces at Nelson's home: he does not address who visits the proposed residence and whether they will be screened for COVID-19 prior to his interactions with them; he does not address his access to medical care if he were to become sick; and he fails to identify any specific COVID-19 precautions that are begin taken at his residence, such as requiring all members of the household to observe recommended social distancing, wear masks, and follow hygiene practices to reduce the risk of exposure to the virus.[10] Accordingly, there is no concrete evidence that the Defendant's risk of contracting the virus would be any lower while released where he has not demonstrated that there are any protections against exposure to the virus than if he were to remain detained at a facility which has implemented extensive precautionary measures to reduce the risk of infection to all inmates.[11]

Furthermore, Sartwell makes no serious effort to show that, if he were released, he would not continue to pose a serious danger to the community. As noted in the government's prior filings, during the detention hearings and in the Magistrate Judge's and District Judge's detention decisions, the safety of the community cannot be ensured if the defendant is released to the home where his wife and children still reside. Electronic monitoring – at any location – would not ensure the public's safety in

---

[10] In actuality, the defendant does not have steady health insurance coverage and could not point to a specific doctor who prescribed him an inhaler – or a specific date of receiving said prescription for an inhaler – for his purported respiratory issues when asked by counsel or Plymouth staff.

[11] *See United States v. Lunnie*, No. 4:19-CR-00180-JGB, 2020 WL 1644495, at *5 (finding that the proposed release to home confinement was not "necessary" for a compelling reason under Section 3142(i) where it was not "tailored to mitigate . . . the defendant's overall COVID-19 risks," including because the defendant did not show that adequate COVID-19 precautions would be taken at his home and there was thus "nothing more than speculation that home detention would be less risky than living in close quarters with others" in jail, "which at least has screening practices and other reasonable COVID-19 precautions in place."); *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *6 (same and denying release of defendant whose diabetes put him at increased risk of serious illness from COVID-19 where the risk of an outbreak at his facility was speculative, he did not show that his proposed release plan would reduce his overall risk, and his release would put pretrial services and law enforcement at increased risk).

any capacity.[12] His ability to create assault rifles *anywhere* and limitless access to weapons should terrify this Court. If Sartwell's access to weapons and the tools used to create them at his own home were not concerning enough, he now proposes an alternate living situation – a friend in Hanover, MA – where he "poses no danger to the community" claiming the location "is not linked to firearms, firearms accessories or tools to potentially build firearms" and requesting that this Court send someone from the probation department to inspect the address to permit his release. D.E. 31-14. Special Agent Michael Belli, at the government's request, conducted a cursory review of records related to Mr. Nelson to learn that he has licenses to carry firearms in four different states[13] (all that have since been suspended for reasons unknown[14]), and more concerning, a .50 caliber firearm registered to him since 2013. The fact that the best alternative plan for release is to the home of a man who owns a sniper rifle should give this Court pause about if indeed there is any feasible way to ensure the safety of the community if the defendant is released from custody.

Finally, the government notes that this Court, as well as other judges in this district, have had the opportunity to consider similar requests made by defendants, even those with documented or otherwise particularized potential health risks, and have denied those requests. *See Pridgen*, 19-cr-

---

[12] The government further recognizes that the defendant's release proposal – which includes electronic monitoring – is not feasible at this time because pretrial services is no longer able to provide location monitoring during the pandemic due to the risk it poses to pretrial services officers. Thus, that condition is no longer capable of being ordered.

[13] The records check does not allow the Special Agent to determine the states (other than Massachusetts) in which Nelson possesses a license to carry. For this reason, the government cannot represent to the Court whether Nelson has any other firearms registered to him in these other states.

[14] The government understands that Mr. Nelson was charged by the state with assault and battery in summer 2019 in connection with a domestic violence incident that occurred at the Hanover, MA address. Said charges have since been dismissed in state court. The Hanover Police Department report connected to the state case shows that arresting officers conducted a CJIS search showing a .50 caliber sniper rifle registered to Mr. Nelson (which was not discovered during nor turned in after the domestic dispute) and licenses to carry out of four different states.

10375-RGS (Stearns, J.) (April 29, 2020) (concluding that defendant with hypertension is a danger to the community and "his medical circumstances are not so exceptional to tilt the balance in favor of his temporary release"); *see also U.S. v. Daigle,* 18-cr-10472-FDS (Bowler, M.J.) (Apr. 16, 2020) (denying motion for release despite defendant's diabetes, obesity, high blood pressure, celiac disease and sleep apnea, which the court "acknowledges... may put her at higher risk of morbidity and mortality if she contracts the virus," where there was a serious concern about the safety of the community); *United States v. Cristian Alvarez Hernandez*, 17-CR-10373-MLW (Kelley, M.J.) (Apr. 24, 2020) (ordering that the defendant, who was detained at Wyatt, remain detained despite prior serious lung injury; "the court does not find that the risks associated with the present pandemic outweigh the serious risk of flight and danger to the community that would be posed by Mr. Alvarez's release"); *United States v. Natanael Velazquez,* 19-cr-10459-RWZ-43 (Hennessy, M.J.) (Apr. 27, 2020) (denying motion for release from defendant at Wyatt despite reported positive COVID-19 case and despite defendant's diabetes, due to the danger he poses); *United States v. Carvajal,* 20-cr-10023-GAO (Boal, M.J.) (Apr. 21, 2020) (ordering detention despite COVID concerns and tuberculosis diagnosis, given danger and risk of flight); *United States v. Nick Castillo Vazquez,* 19-cr-10137-FDS (Kelley, M.J.) (denying motion for reconsideration of detention despite defendanat's diabetes condition, because "the court does not find that the risks faced by Mr. Castillo outweigh the risks posed to society by his release"); *United States v. Angel Calderon*, 19-cr-10459-RWZ (Kelley, M.J.) (May 1, 2020) (denying motion for release of a high ranking member of a Boston Chapter of the Latin Kings despite defendant's obesity, because "this factor does not overcome the dangers inherent in his release").

## CONCLUSION

The government appreciates the gravity of the COVID-19 pandemic, is working to identify detained defendants who should be released because of the risk continued incarceration poses to their health and well-being, and has agreed to release of appropriate individuals under appropriate

circumstances.  *See* April 6, 2020 Barr Memo re: Litigating Pre-Trial Detention Issues During the COVID-19 Pandemic, https://www.justice.gov/file/1266901/download (last accessed April 28, 2020). The defendant is not such an individual; in this case, his generalized concerns about contracting COVID-19 and unsupported "use of an inhaler" (do not outweigh the government's obligation to protect the public.  Here, there is no reason to believe the defendant is not receiving adequate treatment for any condition that *may* make him more susceptible to complications *if* he contracts COVID-19, in a facility that has the ability to provide in-facility medical care.  And there is good reason to believe that the defendant will pose a danger to society if he is released, as well as a risk of flight, and that he will fail to abide by any conditions the Court might impose.  Despite the risk that the defendant may contract COVID-19 while he is incarcerated, the totality of the evidence here dictates a finding that there are no conditions that can reasonably assure the safety of the community.

Even amidst a pandemic, the factors set forth in 18 U.S.C. § 3142 must still guide the Court in determining – on a case-by-case basis – whether pretrial release is appropriate. In Sartwell's case, it is not. Thus, the government respectfully requests that this Court DENY the defendant's request for release and that he remain detained pending trial.

                Respectfully submitted,

                ANDREW E. LELLING
                United States Attorney

By:

                ***/s/ Lindsey E. Weinstein***
                LINDSEY E. WEINSTEIN
                ASSISTANT UNITED STATES ATTORNEY

Dated: May 4, 2020

**CERTIFICATE OF SERVICE**

I, Lindsey E. Weinstein, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

>    */s/ Lindsey E. Weinstein*
>    LINDSEY E. WEINSTEIN